IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| LEWIS COUCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 15-6020-CV-SJ-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lewis Couch seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ improperly found that plaintiff does not meet or equal Listing 12.04 or 12.06 because plaintiff's testimony supports a finding that he meets those listings, (2) the ALJ improperly relied on the testimony of medical expert Alfred Jonas and improperly gave little weight to the opinion of nurse practitioner Cindy Mayberry, (3) plaintiff's wife and mother reported observations consistent with a marked limitation on concentration, persistence and pace, (4) the ALJ improperly found that plaintiff's headaches, edema, dizziness and frequent urination not severe, (5) plaintiff's combined impairments would cause him to miss many days of work per month and the vocational expert testified that such a person could not work, and (6) plaintiff's pain and obesity limit him more than the ALJ found. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On November 3, 2009, and December 23, 2009, plaintiff applied for disability benefits alleging that he had been disabled since September 18, 2008. Plaintiff alleges disability due to

bipolar disorder, arthritis, depression, anxiety, obesity, high blood pressure, sleep apnea, back pain, leg pain, foot pain, fluid retention, dizziness, nausea, trouble focusing, and degenerative disc disease. Plaintiff's application was denied on March 25, 2010. On September 30, 2010, a hearing was held before Administrative Law Judge Douglas Stults. On March 14, 2011, the ALJ found that plaintiff was not under a disability as defined in the Act. On June 28, 2012, the Appeals Council denied plaintiff's request for review. Plaintiff filed a complaint in the Eastern District of Missouri where Judge David Noce remanded the case for further proceedings on August 14, 2013.

On August 4, 2014, plaintiff moved to the Western District of Missouri (Tr. at 1126). On August 25, 2014, a hearing was held before Administrative Law Judge Carol Boorady. On October 28, 2014, the ALJ found that plaintiff is not disabled. Plaintiff has exhausted his administrative remedies, and the ALJ's most recent decision stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."

Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

3

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff, medical expert Alfred Jonas, M.D., and vocational expert Denise Weaver, in addition to documentary evidence admitted at the hearings.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1988 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1988 | $ 1,488.93 | 2002 | $ 0.00 |
| 1989 | 7,275.81 | 2003 | 14,356.45 |

4

| | | | |
|------|-----------|------|-----------|
| 1990 | 5,190.70  | 2004 | 5,871.26  |
| 1991 | 3,441.92  | 2005 | 2,380.54  |
| 1992 | 4,763.33  | 2006 | 0.00      |
| 1993 | 8,872.64  | 2007 | 7,390.81  |
| 1994 | 12,446.00 | 2008 | 17,548.58 |
| 1995 | 13,631.28 | 2009 | 0.00      |
| 1996 | 12,912.78 | 2010 | 0.00      |
| 1997 | 10,327.05 | 2011 | 0.00      |
| 1998 | 12,736.31 | 2012 | 0.00      |
| 1999 | 17,044.70 | 2013 | 0.00      |
| 2000 | 12,476.02 | 2014 | 0.00      |
| 2001 | 0.00      |      |           |

(Tr. at 172, 636-637, 639, 1139-1140, 1151).

From 1999 through 2014, plaintiff worked for the following employers:

1.  Hy-Test, Inc.

2.  Northeast Missouri Community Action Agency

3.  Cargill Meat Solutions Corporation

4.  Nelson Electric

5.  Country Kitchen

6.  Sodexo Management, Inc.

7.  Kelly Services, Inc.

8.  Kraft Foods Group, Inc.

In addition, he claimed self employment during this time.

(Tr. at 1141-1143, 1148-1150).

Case 5:15-cv-06020-REL   Document 17   Filed 03/17/16   Page 5 of 97

**Work History Report**

In a Work History Report dated January 18, 2010, plaintiff reported that his last job was in a bacon plant from 2007 through 2008 where he lifted hog bellies weighing more than 100 pounds, and he did this 12 hours a day, 6 days per week (Tr. at 197). At a previous job at a nursing home working with elderly patients plaintiff states that he worked from 1995 through 1997 for 8 to 16 hours per day, 6 to 7 days per week (Tr. at 197, 203).

**Function Report**

In a Function Report dated January 18, 2010, plaintiff reported living in a trailer with family (Tr. at 205-212). His day consists of sitting on the couch, assisting his children with daily living, cooking, doing dishes, and doing laundry (which he does all day a couple days a week). His impairments cause him to dress slowly, bathe slowly, and have difficulty using the toilet. He needs no special reminders to take care of personal needs, grooming, or to take his medication. When he goes out, he can ride in a car and is able to go out alone. His ability to handle money has not changed since his condition began. He goes to the doctor weekly. He has no problem getting along with others. His impairments do not affect his ability to sit or use his hands. He can only pay attention for 5 to 10 minutes at a time, and he does not finish what he starts.

**Function Report Third Party**

On March 15, 2010, plaintiff's wife, Shawna Couch, completed a Function Report (Tr. at 216-223). She had known plaintiff for 12 1/2 years, and the two spent 24 hours a day together, 7 days a week, parenting their 3 children and 4 other children every other weekend. She reported that plaintiff reads for 1 to 2 hours before lunch, he cooks supper to help her out, he helps her take care of the 7 children, and he sleeps for 11 to 12 hours each night and still

6

takes naps during the day. She reported that plaintiff has no problem with personal care except that he needs reminders to shower.

Plaintiff is able to prepare sausage, biscuits and gravy, and soup. He generally prepares a "4 course meal if not more, daily, that is his only responsibility. Because he likes to eat." Mrs. Couch reported that plaintiff "always has energy" for food, and that food has "always been a priority." This has not changed since his illness, injury or condition began.

Mrs. Couch stated that plaintiff is able to mow, clean, and do laundry as long as he can rest frequently. He does it when he is "pushed or begged." Plaintiff goes out of the house every day, he can drive a car and he is able to go out alone. He shops in stores which takes him 3 to 4 hours. He is able to pay bills, handle a bank account, and count change. He reads and watches TV and is "good" at doing those things.

Mrs. Couch reported that plaintiff's condition does not affect his ability to sit, squat, kneel, understand, use his hands, follow instructions, complete tasks, get along with others, remember, or concentrate. If something is interesting to him, he can pay attention for hours.

The following documents were filed several years later.

**Function Report Third Party**

In a Function Report dated May 22, 2013, plaintiff's mother reported that she helps plaintiff bathe, dress, and clean after having a bowel movement. She reported that when plaintiff goes out, he is unable to do so alone.

**Function Report**

In a Function Report dated May 27, 2013, plaintiff stated that he was living in a camper with his mother (Tr. at 659-666). When asked to describe his day from the time he wakes up until going to bed, plaintiff wrote, "eat, watch some TV, sleep." He reported that his mother washes him, dresses him, and cleans him after he uses the bathroom -- he feeds himself and

7

cares for his hair, the only two things he is able to do on his own. He was no longer preparing his own meals because he could not stand for long periods of time. He was no longer doing any housework or yard work. He would leave his home 3 to 6 times a month, taking public transportation. He was able to go out alone. He was no longer driving because he did not have a vehicle, but he was capable of driving. He was able to shop in stores for 2 hours at a time. He needed no reminders for appointments and was able to go to his doctor appointments alone. His impairments did not affect his ability to understand, follow instructions or get along with others. He could lift about 20 pounds but could not grip well for long periods. He follows both written and spoken instructions well. He was now on medication for nightmares, and he was using a walking stick "when walking very far."

**Impairment Questionnaire**

Plaintiff's mother completed an Impairment Questionnaire dated September 8, 2013 (Tr. at 814-817). She estimated plaintiff could sit for one hour before having to stand up or lie down, that he could lift 20 pounds with one hand and 40 pounds with both hands. She has to clean him after he uses the toilet because reaching that part of his body causes shortness of breath. Plaintiff's mother has never observed plaintiff interacting inappropriately with the public.

**School Records**

Plaintiff was not in special education classes[1] (Tr. at 680). His IQ was measured at 102 (Tr. at 683). With the different methods of measuring IQ, plaintiff's percentile ranged from 69th to 76th (Tr. at 683). His grades in high school for the most part ranged from C to F (Tr. at 682-683).

---

[1]Apparently someone reported to plaintiff's lawyer that he was in special education classes, but the school records specifically state that he was not (Tr. at 694).

8

<u>September 30, 2010</u>

During the September 30, 2010, hearing, plaintiff testified as follows:

At the time of this hearing, plaintiff was 41 years of age and is currently 46 (Tr. at 34, 1157). He was living with his wife and three of his children, ranging in age from 7 to 12 (Tr. at 34, 1157). Plaintiff has a GED and a commercial driver's license (Tr. at 34-35, 1157-1158). He got the commercial driver's license in 2010, two years after his alleged onset date (Tr. at 62, 1185). His past work includes certified nurse assistant, medical aide, maintenance worker, laborer in a shoe factory, and laborer in a pork processing plant (Tr. at 35, 1158).

Plaintiff was 5' 8" tall and weighed 375 pounds (Tr. at 36, 1158-1159). When he was 18 he attempted suicide and was hospitalized (Tr. at 36, 1159). At some point after his discharge, plaintiff stopped taking his prescribed medication and stopped receiving mental health treatment (Tr. at 36-37, 1159-1160). In 1998, when he was 38 or 39 years of age, plaintiff attempted suicide again (Tr. at 37, 1160). He was hospitalized for a 72-hour hold and then was released (Tr. at 37, 1160). He did not continue to receive treatment after his release (Tr. at 37, 1160). In 2007 plaintiff was admitted to a hospital in Quincy, Illinois, due to severe depression and anxiety (Tr. at 37-38, 1160-1161). He was in the hospital for 9 days, and after he was discharged this time he continued treatment (Tr. at 38, 1161). He went into the hospital again in 2010 because he "needed to have a medication evaluation" (Tr. at 38, 1161).

Plaintiff gets very depressed and sad, he feels worthless and hopeless, his anxiety makes him feel like he is running a race and is out of control (Tr. at 39, 1162). He believes he has panic attacks which cause him to feel agitated and he cannot get comfortable (Tr. at 39, 1162). During these attacks, his mind does not concentrate very well (Tr. at 39, 1162). His

9

depression and racing thoughts alternate -- he feels depressed about 80% of the time (Tr. at 40, 1163). On a down day, plaintiff will sleep a lot (Tr. at 41, 1164). He goes to bed at 7:00 or 8:00 in the evening and sleeps through the night until around noon or 1:00 the next afternoon (Tr. at 41, 1164). When he gets up, he eats and then sits around thinking about how depressed and worthless he is (Tr. at 41, 1164). After about an hour of that, he goes back to bed (Tr. at 42, 1165). He lies there for 2 to 3 hours without falling asleep, then he gets back up to eat (Tr. at 43, 1166). Then he sits for 15 to 20 minutes thinking about how he wants the day to end so he can go back to bed (Tr. at 44, 1167). He paces the floor, then he finishes the night off and goes back to bed until the next afternoon (Tr. at 44, 1167). These feelings started back when plaintiff was 12 years of age (Tr. at 42, 1165).

Plaintiff has been seeing a counselor since 2008 trying to work on getting better (Tr. at 45, 1168). He was working in 2008 but he was missing work because he was unable to get up on time, or he was tired so he would call in sick (Tr. at 45, 1168). He was depressed and thought he needed to be sleeping (Tr. at 45, 1168). Plaintiff missed 1 or 2 days of work per week and he was let go because he ran out of points for missing too many days (Tr. at 46, 1169).

On his down days, plaintiff very seldom interacts with his wife and kids (Tr. at 46-47, 1169-1170). During an up day, plaintiff will take his children to the park (Tr. at 47, 1170). He does not go out in "real public places" due to his anxiety (Tr. at 47, 1170). At the park he sits on a bench and watches his kids play on slides, monkey bars and the merry-go-round (Tr. at 47-48, 1170-1171). On up days, plaintiff sometimes has racing thoughts but sometimes does not (Tr. at 48, 1171). About half the time on up days he is having racing thoughts, which prevents him from focusing (Tr. at 48-49, 1171-1172). When he gets racing thoughts, it will go on for 2 to 3 days preventing him from sleeping (Tr. at 58-59, 1181-1182).

If plaintiff's wife tries to encourage him to get out in public and do things, he has a panic attack (Tr. at 49, 1172). Being around 5 or more people, regardless of whether he is interacting with them, causes plaintiff to have a panic attack (Tr. at 50, 1173). Plaintiff has panic attacks 2 or 3 times a week (Tr. at 50, 1173). His panic attacks last for 1 or 2 hours (Tr. at 51, 1174).

Despite plaintiff having testified that the only medication that gives him any side effects is nitroglycerin, plaintiff's attorney asked him if his medications cause him to be sleepy and groggy and he said his Busbar does that (Tr. at 51-52, 1174-1175). Plaintiff had taken nitroglycerin twice in the past three weeks (Tr. at 52, 1175). Nitroglycerin gives him a bad headache and makes him take a nap (Tr. at 52-53, 1175-1176).

Plaintiff suffers from dizziness when he stands up too quickly (Tr. at 53, 1176). This lasts for a "matter of seconds" (Tr. at 53, 1176).

Plaintiff's back gets uncomfortable when he sits for more than 15 or 20 minutes (Tr. at 53-54, 1176-1177). He takes Robaxin (muscle relaxer) every 4 hours for this back pain and it helps (Tr. at 54, 1177). He is able to sit for 2 or 3 hours at a time with this medication (Tr. at 54, 1177). Plaintiff can stand for 20 to 30 minutes at a time (Tr. at 58, 1181).

Plaintiff suffers from edema, which is swelling and cramping of his legs (Tr. at 55, 1178). He is taking medication for this and he elevates his legs 4 or 5 times a day (Tr. at 55, 1178). Because of his medication, he urinates rather frequently (4 or 5 times per hour) for the first 2 to 3 hours of the day right after he takes the medicine, but then the frequency tapers off to about once per hour (Tr. at 55-56, 1178-1179).

Plaintiff eats anything he can get his hands on; but he does not cook, he eats sandwiches and chips (Tr. at 43, 1166). Plaintiff has not done any cooking since his alleged onset date (Tr. at 59-60, 1182-1183). He is able to do dishes and he does yard work (Tr. at 56, 1179). He

does dishes for 10 to 15 minutes at one time (Tr. at 56, 1179). Sometimes when his back and legs hurt he does not do the dishes, and then his wife or kids fill in (Tr. at 56-57, 1179-1180). When plaintiff's legs swell, they hurt and he keeps them elevated (Tr. at 57, 1180). Sometimes when he does yard work, plaintiff gets heart spasms, chest pain and shortness of breath (Tr. at 57, 1180). When plaintiff does work around the house or yard it makes him feel worthy (Tr. at 58, 1181). He does not do dusting, sweeping, mopping, vacuuming, or laundry; he does not take out the trash (Tr. at 60, 1183). Plaintiff drives once or twice a week to take his children to church or to go shopping (Tr. at 60, 1183).

Plaintiff is capable of handling finances and bank accounts, he can count change, he can keep up with when his bills are due and when he has appointments, he reads scripture for a half hour every day (Tr. at 61, 1184).

Plaintiff has not had any alcohol in the past six years (Tr. at 59, 1182). He only uses prescription drugs (Tr. at 59, 1182). He has been told to exercise and he tries to -- he walks 2 to 3 blocks (Tr. at 63, 1186). A year ago (which is a year after his alleged onset date) he was able to walk a mile (Tr. at 63, 1186).

## August 25, 2014

During this hearing after remand, the following witnesses testified: plaintiff, vocational expert Denise Weaver, and medical expert Alfred Jonas, M.D.

### 1.   Testimony of Alfred Jonas, M.D.

Alfred Jonas, M.D., is a psychiatrist (Tr. at 1122-1124).

The diagnosis for bipolar disorder has no support in the record (Tr. at 934-935). In order to have a legitimate diagnosis of bipolar disorder, there must be evidence of at least one episode of mania -- that does not exist in this record (Tr. at 947). Medical professionals will

often diagnose bipolar disorder based on the patient's description of having an unstable mood or irritability, but that is not appropriate (Tr. at 947).

Plaintiff has been taking Geodon at 80 mg per day (Tr. at 948-949). "I will guess that the purpose of prescribing Geodon to the claimant is to treat the thing that somebody thinks is bipolar disorder. The problem is apart from the fact that there is no bipolar disorder, there's nothing in the record that tells us that the claimant has bipolar disorder. Geodon essentially in my experience, I've seen it over the years, doesn't work. That the occasional times that I've heard somebody insist that it really does work is at times that the dose has been the maximum dose which is 160 milligrams a day. Nobody has ever claimed it works at a dose lower than that. So this claimant is getting 80 milligrams a day, which is half the dose that anybody would even want to allege does anything. . . . And we don't see the problems for which Geodon should be considered treatment." (Tr. at 948-949).

With regard to generalized anxiety disorder and posttraumatic stress disorder, there is no support for posttraumatic stress disorder based on plaintiff's testimony (Tr. at 935). Unhappy situations like he described are "not at all the kinds that would qualify for this diagnosis." (Tr. at 935). The existence of the type of anxiety contemplated by generalized anxiety disorder is "a little unclear from the record." He was incarcerated in 2009, there were no real problems, there is not much of anything in those records about anxiety (Tr. at 935-936). He has been frustrated, but there is nothing supportive of Listing 12.06 in the A criteria (Tr. at 936).

With regard to the B criteria, there is no information about activities of daily living. Exhibit 15F page 7 from September 14, 2010 (records of emergency room visit after experiencing chest pain while doing yard work) says he got himself physically stressed out working in the yard and not drinking enough fluids, so he was attending to household tasks

13

(Tr. at 936). "That I say is very minimal and I really don't have anything else. So I did not analyze item one of the B criteria." (Tr. at 936). With regard to social functioning, Cindy Mayberry is not an accepted treatment source, but there is no social impairment in 14F (Ms. Mayberry's Medical Source Statement dated October 5, 2010) but marked social impairment in 20F (Ms. Mayberry's Medical Source Statement dated June 2, 2014). There is nothing in the record that demonstrates why we should assume that there is a marked social impairment (Tr. at 936-937). Dr. Jonas did not see anything in the record overall to explain why plaintiff would be considered significantly functionally worse in those four years. He believes the file overall supports "probably up to about a moderate social impairment. I'm not sure it's that high but it could be." (Tr. at 937).

With regard to concentration, persistence and pace, plaintiff has either no impairment or maybe a mild one (Tr. at 937). Based on his review of the record, Dr. Jonas cannot explain how the nurse (Ms. Mayberry) believed plaintiff had a marked or extreme impairment for complex tasks (Tr. at 937). "There is nothing in the record that shows us an example of somebody who is getting more and more dysfunctional. So my best guess in reality, looking at this record overall, is that there's no impairment to a mild impairment." (Tr. at 937-938).

There is no evidence of specific episodes of decompensation (Tr. at 938). During incarceration plaintiff worked and only missed one day due to diarrhea (Tr. at 938). In May 2010 he was looking for work, was not able to find it but not because of psychiatric symptomatology (Tr. at 938). In Exhibit 18F, page 25 (visit with nurse Corrie Willis on April 15, 2014) he says he feels unable to work because of depression "but I don't think the record really supports that by that point, he was so much more depressed that he was actually worse." (Tr. at 938). He was taking Zoloft (antidepressant) when he submitted a medication list, but

14

the dose was only 100 mg. "If anybody thought that he was significantly depressed or getting more depressed, they certainly would have raised the dose." (Tr. at 938).

"[T]here could be a possibility of a possibly meaningful social impairment. If there is, it might be the kind of thing that would prevent him from functioning well in an unrestricted way with the broad general public. And I really don't see anything more here." (Tr. at 938-939). None of plaintiff's impairments meet or equal a listed impairment (Tr. at 939).

"There's nothing that's made really clear but just reading between the lines, I'm thinking of the possibility that there could be potentially meaningful social impairment which as I was suggesting with you, and it's really not more than that, could potentially mean that he might have trouble functioning in an unrestricted way with the broad general public. In theory if he has that kind of problem, it could also prevent him from functioning at a relatively higher level with co-workers or supervisors when heavy teamwork is involved. So if a task is sort of centrally dependent upon somebody's excellent ability to work well with other people, that could be a problem here, but I'm not sure if it is." (Tr. at 939).

Plaintiff's ability to understand, remember and carry out instructions is not affected by his impairments (Tr. at 939-940). There is nothing in the record that supports a conclusion (or provides the ability to make a conclusion) regarding interacting appropriately with the public (Tr. at 940). "I don't really see anything that would lead us to an assumption that he could not deal with supervisors" based on prison records and no problems dealing with the various people who treat him (Tr. at 940). With regard to getting along with co-workers, "There's just really nothing here, there's nothing that points us anywhere." (Tr. at 940).

There is no indication in the record regarding his ability to respond appropriately to usual work situations and to changes in a routine work setting (Tr. at 940). "There's no basis for us to form a conclusion about it. Like for example there is a reason for us to assume that he

could get along with supervisors because he gets along with supervisor-like people, like for example correctional officers and treaters. So those would be people that exist sort of like supervisors. He gets along with them. So that points us to an answer. There's nothing that points us to an answer one way or the other, about the other areas you're asking about." (Tr. at 941). In his prison records there is no indication that he had any major problems with the other inmates, so we may be able to say he would not have any problems with co-workers either (Tr. at 942). "It's a little indirect but it's sort of the best we have because the record really is not about those kinds of things." (Tr. at 942). "I don't think Dr. Stacy has given a reason in this record to conclude on his own that there is that kind of CPP [concentration, persistence and pace] related impairment." (Tr. at 943).

With regard to nurse Cindy Mayberry's two opinions -- "[W]e would think that if there was a marked social impairment and let's say a moderate to extreme CPP impairment, if that was true, in June, 2014, and if nothing happened to change the claimant's condition from let's say the end of 2009, until the middle of 2014, then the doctor who completed 4F, page 4 (November 16, 2009, medical record of nurse Cindy Mayberry and collaborating psychiatrist Jeffrey Harden, D.O.) should have seen all kinds of problems. But the doctor didn't see any problems, and the mental state examination was normal. So if those problems existed, a marked social impairment and up to an extreme CPP impairment, the mental state should not have been normal unless the patient got worse." (Tr. at 944).

With regard to the opinion about missing days of work, "that's something that a treating doctor wouldn't know, if the doctor's patient would likely miss work a certain number of days unless the patient was missing appointments with some frequency. So that leads to where do these conclusions and these statements come from. Are the doctors witnessing somebody who looks extremely anxious, or is their patient telling them he's extremely anxious.

16

If he's extremely anxious, if he was in 2009, and he was in June, of this year -- now extreme is as bad as it gets. That's the extreme of the range. So that means you should see somebody who looks very anxious. I will tell you that I didn't talk to anybody [during this hearing] who sounded extremely anxious but I can't see the claimant. Maybe he'll say he looks bad, and more anxious than he sounds. But again, if the anxiety level is extreme, everybody should see it all the time." (Tr. at 945). No one with an extreme limitation in concentration, persistence or pace would be able to acquire a commercial driver's license (Tr. at 946). The fact that plaintiff is looking for work suggests that he does not have a significant problem with concentration, persistence or pace, or a significant social problem (Tr. at 946). He may have some underlying social problem, but it is not so dramatic as to prevent him from functioning (Tr. at 946).

People with dysthymic disorder can have good days and bad days, but people with a diagnosis of depression typically do not have good days (Tr. at 952). People with anxiety can have good days and bad days (Tr. at 952). People with generalized anxiety disorder typically appear anxious (Tr. at 952). If they have social anxiety or a specific phobia, they will only seem anxious in those situations (Tr. at 952-953).

With respect to plaintiff's weight, at 444 pounds (as he testified this day), he would be considered massively obese (Tr. at 950). The only way to say that his weight is related to his depression would be to find a time during his life when he was not overweight and not depressed, and if the weight gain occurred the same time as the depression, then one could say the two were related (Tr. at 950-951). If medication for depression were to cause weight gain, it would not be significant (Tr. at 951). If plaintiff's massive obesity were due to his depression medication, no doctor would sit idly by and let that go on, the doctor would change the medication (Tr. at 951).

17

## 2.    Testimony of plaintiff.

At the time of this hearing, plaintiff weighed 444 pounds and was 5' 9" tall (Tr. at 949-950, 954-955).  Plaintiff had gained about 150 pounds in the previous year and a half[2] (Tr. at 955).  He weighed less than 200 pounds as a teenager, and he started gaining weight in 2000 or 2001 (Tr. at 955).  Whenever plaintiff gets depressed, he eats, and he noticed that he had become depressed in 2000 or 2001 (Tr. at 956).  Plaintiff is borderline diabetic and his doctors are working with him to try to lose weight (Tr. at 976).  In the past two months he had lost 26 pounds (Tr. at 977).

Plaintiff was 43 years of age at the time of this hearing (Tr. at 954).  Plaintiff and his wife had separated sometime in 2010 (Tr. at 954).  He has six children but none of them live with him (Tr. at 954).  Two weeks before the hearing (or approximately the beginning of August 2014) plaintiff moved into a residential care facility (Tr. at 956).  His CSS thought it would be beneficial for him to move there to help him get his medications adjusted and to become more social around people (Tr. at 956).  Plaintiff is not very good at meeting new people -- he gets anxiety (Tr. at 956).  Twice a week plaintiff goes into a room where people

---

[2]The testimony went as follows:
Q.  And your weight that you just told me was?
A.  444 pounds.
Q.  444?  And one question that I had for you has that been your normal weight or has that changed?
A.  I've actually gained weight in the past year and a half.
Q.  How much have you gained?
A.  About 150 pounds.
Q.  So you've gone up 150 pounds in the last year and a half?
A.  Yes, sir.
Q.  And prior -- and so before you gained the 150 pounds, so you were probably 380, or so?
A.  Yes.
Q.  Okay, 380, or thereabouts.
(Tr. at 954-955).
If plaintiff gained 150 pounds and weighed 444 after that 150-pound weight gain, he would have weighed 294 pounds a year and a half earlier, not 380.

18

are socializing and may come up and introduce themselves, and this causes him to feel "anxious, kind of out of place, nervous." (Tr. at 957). He does not care to be there and he gets quiet (Tr. at 957). Plaintiff's records from February 11, 2014 (about six months earlier) reflect that he felt like he could "now go to Wal-Mart without having a panic attack." (Tr. at 958). Before that when plaintiff went to Wal-Mart, he did not socialize, he just went there and got what he needed and got out (Tr. at 958).

Plaintiff wanted to move into the residential care facility because he was sleeping 16 to 18 hours a day "seven days a week" (Tr. at 961). They get him up for breakfast, and two days a week they make him go interact with other people (Tr. at 962). They make him take his medications regularly "instead of just whenever I take a notion to take them." (Tr. at 962). Before moving into this facility, plaintiff would take his medications whenever, sometimes not at all, and it was because of his depression (Tr. at 962).

Medicaid pays for plaintiff to live at the residential care facility (Tr. at 969). He does not remember having an evaluation in order to get Medicaid to cover these expenses -- he has been on Medicaid for several years (Tr. at 969). There are "a lot of personalities in the facility that I'm at, and it's an adjustment for me." (Tr. at 977). He does not really like living there (Tr. at 977). He may try to move back in with his aunt and uncle for the winter, which is a depressing time for him (Tr. at 977). He is scared to live by himself because he has never been by himself since he was 16 (Tr. at 977). He lived with his aunt and uncle before moving into the residential care facility (Tr. at 977). Before that plaintiff lived with his mother for four years after he and his wife separated (Tr. at 977-978). Plaintiff and his mother were living in a small place and were starting to get on each other's nerves (Tr. at 978). He thought she was making him depressed (Tr. at 978). So he moved in with his aunt and uncle for a few weeks before going into the residential care facility (Tr. at 978).

19

Plaintiff is not aware of ever having been diagnosed with posttraumatic stress disorder (Tr. at 930-931).  When asked about trauma that could have resulted in PTSD, plaintiff said that he was going through a divorce, his kids were graduating from school and moving away, and he has a grudge against his mother for being kind of mentally abusive toward him when he was younger (Tr. at 932-933).

Plaintiff did not agree with Dr. Jonas, the medical expert, that there is no evidence to support a diagnosis of bipolar disorder (Tr. at 959).  "I do have manic attacks.  I have elevation of mood.  It'll go up one day for about three days.  It'll stay that way, then I drop off, and I stay depressed for like a week.  And then I'm just -- then I mellow -- I level out.  If I'm not on my medication." (Tr. at 959).  Plaintiff said he had a regular manic phase the middle of every month (Tr. at 959).  "And if I'm not [on] the medication then I drop completely out.  And I get totally reserved and withdrawn." (Tr. at 959-960).  Plaintiff's manic episodes last three to four days and there was never a time when he was getting them less often (Tr. at 960).  After plaintiff stopped drinking, he got "uncomfortable feelings" and he was not sure what they were (Tr. at 960-961).  "And whenever I went in the doctor, that's when they said that I was -- it was bipolar issues.   And they started trying me on different medications, and the Geodon was the only thing that seemed to work at the time." (Tr. at 961).

Whenever plaintiff sits in a chair for longer than an hour, his legs begin to swell (Tr. at 963).  To alleviate that, he lies down and elevates his legs[3] (Tr. at 963).  He is trying not to lie down so much now that he is at the residential care facility, but he still lies down 2 to 3 1/2 hours a day due to leg swelling (Tr. at 963-964).  He does this in the evening after his final

---

[3]The ALJ asked plaintiff why his legs would have been swollen during the time when he was sleeping 16 to 18 hours a day if lying down is what he does to help the swelling (Tr. at 970). Plaintiff said, "Yeah, actually I did notice some swelling in my legs even though I was sleeping and elevated -- I'm not exactly sure what was causing that but there was edema in both of my legs and my feet." (Tr. at 970-971).

20

meal of the day (Tr. at 964). Plaintiff is in the social group from 10:00 until 3:30 on one day, and until 7:00 on another day (Tr. at 964). Because he has to sit in a hard chair there, his legs swell and his back starts bothering him (Tr. at 965, 967). He has to get up to walk around a little bit about every half hour (Tr. at 965). The Lasix (diuretic) helps with the swelling; but right after he takes it, he has to urinate frequently (Tr. at 965-966). Since he has switched to this diuretic, the urination is not as frequent and this medication does help him with the swelling (Tr. at 972).

The first week he was in the residential care facility, he had to leave the social group because of back pain from sitting (Tr. at 968). That did not happen again after that first week (Tr. at 968).

Plaintiff talked to his doctor about dizziness, and the doctor thought it may be because plaintiff is trying to get up too soon or maybe his equilibrium is off a little bit (Tr. at 966). The dizziness happens when he changes positions, but it usually only lasts for a couple seconds (Tr. at 966). Plaintiff does not get headaches as often anymore (Tr. at 973). He believes it is because of his blood pressure medication (Tr. at 973). He has a headache about "once a month maybe" (Tr. at 973). The headaches last for an hour or two -- he does not take any medication for them (Tr. at 973). "They haven't prescribed me any. They don't figure it's significant enough to have to have medication for it." (Tr. at 973-974).

Plaintiff has had back troubles since he was a child (Tr. at 980). He went to a chiropractor when he was a kid (Tr. at 980). Plaintiff was told to do stretches and exercises for his back pain, which is constant (Tr. at 974). He takes Hydrocodone (narcotic) and Robaxin (muscle relaxer) twice a day for his back pain (Tr. at 974-975). These medications help his pain so that it is tolerable and he can move around and be mobile (Tr. at 975). He has been

taking these medications for at least a year (Tr. at 975). But his pain is worse now than it was a year and a half ago (Tr. at 975).

Plaintiff gets short of breath when he walks, but he has not been diagnosed with any breathing problems (Tr. at 976). This has gotten worse since he gained weight (Tr. at 976).

Plaintiff's medications make him drowsy, tired, sleepy, thirsty, and they give him a dry mouth (Tr. at 975). Some of them make him agitated (Tr. at 975). Zoloft (antidepressant) was making him tired so he had to start taking it at night instead of in the morning (Tr. at 976). Plaintiff has trouble going to sleep, but then he has trouble waking up in the morning -- he likes to sleep throughout the day (Tr. at 976).

In early to mid-2010 (two years after his alleged onset date), plaintiff was trying to find work in a factory, fast food restaurant, trucking company, "anything that was available at the time. I was trying to get a hold of any job I could get" (Tr. at 933). He was unable to get a job driving a truck because of a felony conviction less than 7 years old (Tr. at 934). Plaintiff lost his driver's license due to "child support" about three months before this hearing (Tr. at 969). They took his commercial driver's license away about two months before the hearing because he was not able to pass the physical (Tr. at 969). They did not know he had a commercial driver's license when his regular license was taken away (Tr. at 970). Plaintiff said his weight is one reason he could not pass the physical (Tr. at 970). "I get short winded. I have trouble staying focused. My back, I can't sit for long periods of time." (Tr. at 970). When plaintiff originally got his commercial driver's license in 2010, he was able to pass the physical (Tr. at 981). He never worked as a truck driver, though, because of insurance problems and his felony conviction (Tr. at 981).

Plaintiff stopped drinking in 2005 (Tr. at 970). He does not use illegal drugs (Tr. at 970).

22

Plaintiff last worked in a bacon manufacturing plant (Tr. at 978). He took hog bellies off the racks and laid them on a conveyor belt (Tr. at 979). After an hour of that, he would rotate positions and press them for an hour (Tr. at 979). Then he would rotate again and set the lines up for an hour (Tr. at 979). One morning he showed up for work, he was sitting in his vehicle, and he just could not go in -- his nerves and his anxiety had escalated to the point where he could not go in (Tr. at 979). He lost his job because when you miss work you lose points and he lost too many points (Tr. at 979). He thinks the fact that he was around so many people and was never sure whom he would be working with from day to day or who his boss would be from day to day is what caused him to be anxious about going to work (Tr. at 979-980). Plaintiff worked at that job for a year and a half (Tr. at 980). He lifted about 75 pounds on the job (Tr. at 980).

Plaintiff does not believe he could work at a job such as a security monitor, sitting and monitoring a screen and left pretty much to himself, because he is not able to focus (Tr. at 981). When asked what causes his problems focusing, plaintiff said, "I really -- it's been something I've dealt with ever since I was a young kid. I had a real problem with it in school. I had to have learning disability classes and stuff. I've always had a problem with being able to focus." (Tr. at 982).

3.     Testimony of Denise Weaver, vocational expert.

Plaintiff's past work during the last 15 years includes the following: laborer, heavy exertional level; laborer, medium exertional level; self employment doing yard work, home repair, etc., similar to janitor, medium exertional level; and appliance delivery or tractor trailer moving van driver, very heavy exertional level with an SVP of 4 (Tr. at 983). He worked as a certified nurse assistant in the past, but it was more than 15 years ago (Tr. at 983).

The first hypothetical involved a person who could lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours per day; sit for 6 hours per day; would need a sit/stand option to change position every 30 to 60 minutes for a few minutes at a time while remaining at the work station; no climbing ropes, ladders or scaffolds; no concentrated exposure to temperature extremes, vibration or work hazards; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl (Tr. at 984). The person would be able to understand, remember and carry out simple to moderately complex instructions consistent with semi-skilled work (Tr. at 984-985). Such a person could not perform any of plaintiff's past relevant work because the exertional level of those jobs was more than light (Tr. at 985). The person could work as a mail clerk, DOT 209.687-026, light, with an SVP of 2 (Tr. at 985). There are 51,250 jobs in the country and 1,890 in Missouri (Tr. at 985-986). The person could also work as a file clerk 2, DOT 206.367-014, light, SVP of 3, with 100,000 in the country and 2,000 in Missouri (Tr. at 986, 987). The person could work as a photocopying machine operator, DOT 207.685.014, light, SVP of 2, with 100,000 in the country and 1,500 in Missouri (Tr. at 987).

The second hypothetical was the same as the first except the person would be able to understand, remember and carry out only simple instructions consistent with unskilled work (Tr. at 986). The vocational expert testified that such a person could still perform those same three jobs (Tr. at 986).

The third hypothetical was the same as the second except the person could have only occasional contact with co-workers and supervisors, no tandem tasks, and no contact with the general public. The person should be able to work independently (Tr. at 987-988). Such a person could work as a mail clerk, file clerk 2, or photocopy machine operator (Tr. at 988).

24

The fourth hypothetical was the same as the third except the person could not kneel, crouch or crawl (Tr. at 988). Such a person could work as a mail clerk, file clerk 2, or photocopy machine operator (Tr. at 988-989).

The fifth hypothetical was the same as the fourth except the person had to use the restroom every 15 to 30 minutes for the first half of the day (Tr. at 989). Such a person could not perform any work -- typically an employer would expect an individual to use the standard break periods to use the restroom, and that is approximately every 2 hours throughout the day (Tr. at 989). Sneaking in an extra morning or afternoon bathroom break would probably be ok, but not every 15 to 30 minutes (Tr. at 990).

The sixth hypothetical was the same as the fourth except the person would be limited to sedentary work instead of light work (Tr. at 992). Such a person could work as a data examination clerk, DOT 209.687-022, sedentary, SVP of 3, with 1,000,000 positions in the country and 50,000 in Missouri (Tr. at 985, 992-993).

The seventh hypothetical was the same as the sixth except the person would be limited to unskilled work (with the ability to understand, remember and carry out only simple instructions) (Tr. at 993). Such a person could work as a dowel inspector, DOT 669.687-014, sedentary, SVP of 2, with 16,500 in the country and 430 in Missouri (Tr. at 993). The person could also work as a surveillance system monitor, DOT 379.367-010, sedentary, SVP of 2, with 75,000 in the country and 1,000 in Missouri (Tr. at 993). These sedentary positions do have a sit-stand option every 30 minutes for a few minutes at a time while remaining at the work station (Tr. at 993-994). If the person had to walk away from the work station during those few minutes, he would not likely be retained by the employer (Tr. at 994-995).

Typically a new employee would not be permitted to miss more than 7 workdays in the first year on the job (Tr. at 991). If a new employee were off task 15 to 20 percent of the time,

the employer would likely terminate the employee and find someone who could better complete the task (Tr. at 991).

C.   *SUMMARY OF MEDICAL RECORDS*

On September 26, 2007, plaintiff met with Brenda Sidwell, a social worker, for individual counseling (Tr. at 291). "He has not made an appointment for several weeks. He was dressed casually today; affect was good; mood was good. Lewis reports that he is doing quite well today. . . . He has acquired employment and feels that this has been an emotional boost for him. He has acquired his Medicaid and this has also been a financial reliever for him. He states that he is feeling that things are turning around for him. His mood is much improved. He is not feeling depressed and is quite hopeful about the future. Lewis states that his job has given him a boost in self-confidence and that he is feeling quite confident in being successful at his job and is looking forward to working tonight. He states that he has gotten a very good job which will enable him to provide for his family. He is not feeling hopeless about his situation. Due to his marked improvement, his need for counseling has been reduced."

Two months later, on November 23, 2007, plaintiff was referred by Adair County Family Services for an evaluation in support of his application for medical assistance (Tr. at 362-363). The evaluation was performed by Delores Lesseig, a nurse practitioner. Plaintiff reported having six children plus some step children; he was married to a woman he had been with for the past nine years. Plaintiff abused alcohol since age 12 and said he drank every day until four years ago, mostly hard liquor. "He has approximately twenty arrests for various offenses including failure to pay child support. He has had approximately thirty jobs throughout his life and has been fired on two occasions. The longest job that he ever maintained was approximately two years at a factory but he has been unemployed for the past

26

six months." At the time plaintiff was taking Lexapro (selective serotonin reuptake inhibitor ["SSRI"] which treats depression and anxiety) and Nortriptyline (tricyclic antidepressant).

> MENTAL STATUS EXAMINATION: Mr. Couch was casually dressed and adequately groomed. His attitude was cooperative, his speech monotone and his affect flat. He described his mood as alternating between depressed and irritable but denied any specific history of mania. He also said that he hears his name called and voices tell him that he should die in his sleep. He reported that he almost has continuous thoughts of overdosing, using carbon monoxide but has no intention of doing so. He also admitted that he had thoughts of harming others because he is angry at the world but has no plan or intention to do so. He said that there is nothing good in his life, he cannot find a job, he has no drivers license due to unpaid child support and likely will go to prison in September if he does not have a full time job by then. He admitted that he is an over eater and has a problem with obesity. He described his energy, motivation and concentration all as diminished and expressed a total lack of interest in pleasurable activities. He reported sleeping three to four hours per night and has nightmares and flashbacks.[4] He also reported feeling panic symptoms around other people and prefers to be alone. He admitted to obsessing about many things at times. He was able to abstractly interpret a proverb. His memory and concentration were described as poor.

Ms. Lesseig assessed recurrent major depressive disorder, social anxiety disorder, posttraumatic stress disorder, unemployment, difficulty with access to health care and legal problems, resulting in a GAF of 35.[5]

On March 19, 2008, plaintiff was seen by a nurse practitioner at Northeast Missouri Family Health Clinic complaining of a headache and flu symptoms for the past three days (Tr. at 376). Plaintiff was observed to be alert and pleasant. His gait was normal. He had no peripheral edema. He was assessed with a sinus infection and headache. He was given a prescription for an antibiotic and was given an injection of Toradol for his headache.

---

[4]There is no elaboration regarding plaintiff's flashbacks.

[5]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

On July 20, 2008, plaintiff went to the emergency room at Northeast Regional Medical Center complaining of nausea, vomiting and diarrhea for two days (Tr. at 419-426). It began while he was at work at Adair Foods. Plaintiff had to leave work due to diarrhea. Past medical history included hypertension and severe depression. He reported that his regular medications were Lisinopril (for hypertension), Clonidine (for hypertension), Metoprolol (for hypertension), Hydrochlorothiazide (for hypertension), Nortriptyline (antidepressant), and Wellbutrin (antidepressant and smoking cessation aid). "He quit smoking and drinking approximately 4 years ago. Before that he had smoked and drank extensively from the age of 16 on and was a severe alcoholic." Plaintiff reported a family history of bipolar disorder, depression and schizophrenia. He denied headaches, shortness of breath, frequent urination, edema, changes in mood, increasing anxiety, memory problems, and joint problems. On exam he had no edema, normal muscle strength, normal and appropriate mood and affect, and sound judgment. He was fully oriented. "His lower thoracics actually have fairly decent mobility for a gentleman of his size. There is no . . . decreased range of motion or tenderness noted." Plaintiff was given potassium and phosphorus until his levels were back to normal. He was diagnosed with viral gastroenteritis, or stomach flu.

On August 11, 2008, plaintiff was seen by a nurse practitioner at Northeast Missouri Family Health Clinic and said he could not hear out of his right ear -- he had gone swimming in a lake (Tr. at 375, 442). He complained of being fatigued every day, and a sleep study to test for sleep apnea was discussed. Plaintiff weighed 302 pounds. Plaintiff was told to continue taking Wellbutrin and he was given medication for his ear. No mental health diagnoses were made.

On September 2, 2008, plaintiff was seen at Northeast Missouri Family Health Clinic for cold and allergy symptoms (Tr. at 440). His ear was bothering him. He was assessed with

upper respiratory infection and an ear infection. No pain-related or mental health diagnoses were made.

September 18, 2008, is plaintiff's alleged onset date.

On November 14, 2008, plaintiff was seen by a nurse practitioner at Northeast Missouri Family Health Clinic for heartburn and foot fungus (Tr. at 373, 439). He asked for a sleep study to test for sleep apnea. Plaintiff weighed 315 pounds. Plaintiff had a flu vaccine, he was given medication for the fungus, and he was told a sleep study would be arranged. No mental health diagnoses were made.

On December 3, 2008, plaintiff had a sleep study after which use of a CPAP machine was recommended (Tr. at 379-380, 427-430, 462-465).

On January 16, 2009, plaintiff was examined at the Missouri Department of Corrections on intake by a nurse, a psychiatrist, and a dentist (Tr. at 293-299). He denied headache, syncope, dizziness, joint pain, edema, frequent urination, and excessive tiredness or weakness. Although plaintiff reported having acute dental problems, he denied having "any medical problems we need to know about." On exam his blood pressure was 120/80. A mental health intake screen was completed and no mental health referral was requested or needed. Plaintiff's only medical complaint was a spider bite on his toe. His medications were for hypertension.

On January 20, 2009, plaintiff was seen by a nurse for complaints of acute back pain (Tr. at 303-304). He denied frequent urination. His gait was observed to be steady, he had equal strength in his extremities, his range of motion was normal, his coordination was normal. He was given Tylenol, his lifting was restricted to 25 pounds for the next five days, and he was told to follow up if his discomfort prevented him from carrying out normal activities.

29

On January 30, 2009, plaintiff was seen by a nurse for complaints of sinus problems (Tr. at 311). He also complained of headache and said he thought that was due to stress.

On February 2, 2009, plaintiff saw a doctor at the BOP; plaintiff weighed 315 pounds, exercise was encouraged, "lifestyle modifications" were recommended (Tr. at 306-308, 312).

On February 10, 2009, plaintiff weighed 307 pounds (Tr. at 313).

On February 23, 2009, plaintiff weighed 308 pounds (Tr. at 315).

On March 2, 2009, plaintiff fell standing on a chair getting into a top bunk (Tr. at 316-319). He said he hurt his left knee and lower back. He weighed 302 pounds. He was treated for a laceration of the eyelid and a band-aid was applied to his forehead.

On March 4, 2009, plaintiff saw a nurse with complaints of back and knee pain (Tr. at 320-322). He wanted to be assigned to a bottom bunk, asked for x-rays of his knee and back, said it was difficult for him to stand for long periods of time, and said he needed to lie down until he knew what was going on with his back. The nurse observed no swelling of the left knee and noted that plaintiff was able to ambulate without difficulty. On this day he refused his mental health medication (Trazodone, an antidepressant and sedative) without providing a reason. He was counseled regarding the risks of not taking this medication.

On March 6, 2009, plaintiff was seen by a doctor regarding his knee and back pain (Tr. at 322-323). Plaintiff weighed 298 pounds. 2+ pedal edema[6] was noted on his lower left leg, his knee was tender to palpation, the joint was stable. He was diagnosed with trauma to left leg and knee from fall, muscle spasms in the lower back, and a sinus infection. He was given analgesic balm for his lower back and Loratadine (antihistamine) with an 180-day

---

[6]Swelling in the lower extremities caused by excess fluid. 2+ edema means the pit is 2 to 4 mm deep and the indent disappears in 10 to 15 seconds.

prescription. He was told to miss work for 2 days to rest his leg, he was assigned a bottom bunk, and he was encouraged to lose weight.

On April 23, 2009, plaintiff weighed 298 pounds (Tr. at 329).

On May 8, 2009, plaintiff weighed 296 pounds (Tr. at 329). He was prescribed Naproxin (non-steroidal anti-inflammatory) for back pain.

On May 13, 2009, plaintiff weighed 290 pounds (Tr. at 331).

On June 5, 2009, plaintiff was seen by a nurse (Tr. at 332-333). Plaintiff had been taken to a different facility, but it was full so he was returned and was seen by the nurse in Receiving. He was observed to be quiet but not withdrawn, hostile or angry. No manic behavior was observed. He denied any complaints. He weighed 285 pounds.

On June 13, 2009, plaintiff weighed 295 pounds (Tr. at 334).

On July 9, 2009, plaintiff saw a doctor with complaints of blisters on his great toes (Tr. at 339-340). "States walking 5-6 miles a day." Plaintiff weighed 306 pounds. He had been wearing boots while walking, "getting tennis shoes for walking."

On July 17, 2009, plaintiff saw a doctor; he weighed 283 pounds during this visit (Tr. at 341). His Naproxin (non-steroidal anti-inflammatory) was refilled for chronic back pain.

On August 10, 2009, plaintiff saw a doctor for indigestion (Tr. at 344-345). He weighed 298 pounds. Antacid prescriptions were provided. That same day plaintiff refused his Clonidine (anti-hypertensive and sedative) and Fluoxetine (SSRI which treats depression) (Tr. at 345).

On August 20, 2009, plaintiff saw a psychiatrist for a follow up (Tr. at 347-352). He weighed 296 pounds. His hypertension was listed as stable. He was encouraged to exercise.

On August 31, 2009, plaintiff was released from custody (Tr. at 352).

On November 3, 2009, plaintiff filed an application for disability benefits.

On November 16, 2009, plaintiff was seen by Cynthia Mayberry, a nurse practitioner (Tr. at 359-361, 364-366, 415-417). Plaintiff had been referred for psychiatric evaluation by Adair County Division of Family Services. Plaintiff complained of severe depression. He had been released from prison two months earlier with a prescription for Wellbutrin and Nortriptyline. "[B]oth medications helped with his depression and his sleep was aided by the Nortriptyline."

> He had a suicide attempt at age eighteen with a motorcycle wreck and he came out essentially unscathed, except cuts and bruises. In 1997 he had another suicide attempt by overdosing on pills and was in Mid Missouri Mental Health for four days. Lewis was admitted for eleven days in Blessing Hospital in 2007 due to severe depression, on the verge of suicide. . . . Lewis states he currently has difficulty many days getting out of bed, he make[s] several attempts, trying to push himself but is unable to force himself to move. A few days a week he feels ok and he is able to function around the home.

Plaintiff reported having been arrested many times, usually related to wild situations when he was drinking or non payment of child support. Plaintiff admitted to be a recovering alcoholic. Most of this record reflects plaintiff's reports rather than any observations:

> Lewis professes to a poor employment history. He describes his longest job as lasting two years. This job is providing yard work for people. Lewis states this job gives much more flexibility and can work around his moods. . . . He has mainly had factory jobs that lasted between six months to one year. He describes not having problems with being fired as much as an inability to continue to show up for work on a consistent basis due to his depression and at the time alcohol intake.

> * * * * *

> MENTAL STATUS EXAMINATION: Lewis appears with casual attire, a steady gait, no speech eccentricities and linear thought processes. He has a cooperative attitude. Lewis denies any hallucinations, delusions or feelings of paranoia. He describes his primary mood as irritable and frustrated and his affect displayed anxiety. . . . Lewis has poor concentration which he states he has had throughout his life. . . . Lewis has nightmares every night and frequent flashbacks to past events. He describes having a full blown panic attack two to three times per month. . . . He is oriented to person, place and time. He can abstract a simple proverb. . . . He describes his insight into his moods and what triggers them as fair. He describes his judgment as usually thinking before he acts unless he is angry. He describes having feelings of anger always when he was drinking and fairly often now that he is sober. He describes that he has had a very good memory for long term incidences, but his short term memory is very poor, not being able to recall what he ate a couple of meals ago.

32

Plaintiff was able to name three objects both immediately and approximately five minutes later. He was able to count down by sevens from 100. He missed only one and stayed on task after his mistake. He was able to name six of the recent past presidents. He correctly named three major cities.

DIAGNOSTIC IMPRESSIONS:
Axis I:         Post Traumatic Stress Disorder
                Agitated Major Depressive Disorder
                Generalized Anxiety Disorder with Panic
                Alcohol Dependency, in remission
Axis II:        No diagnosis
Axis III:       Obesity
                Hypertension
Axis IV:        Legal Difficulties
                Financial Difficulties
                Problems with Primary Support Group
                Other psychosocial and environmental issues
Axis V:         Current GAF 43[7]

CASE DISCUSSION AND TREATMENT RECOMMENDATIONS: It is recommended that Lewis have ongoing psychotropic medication management. Therapy is also recommended. . . .

(Tr. at 359-361, 364-366, 415-417).

On December 10, 2009, plaintiff was seen at the Northeast Missouri Health Council and complained of depressed mood (Tr. at 371). Much of the brief record is illegible; however, plaintiff's complaint with his medication was that it caused erectile dysfunction and he requested medication for that. He was assessed with depression, gastroesophageal reflux disease, and hypertension. His Lisinopril (for hypertension) was refilled and prescriptions were written for Prozac (antidepressant) and Zantac (antacid and antihistamine); counseling was recommended.

---

[7]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

33

On December 15, 2009, plaintiff was seen at Northeast Missouri Family Health Clinic (Tr. at 437, 450-451). He weighed 340 pounds. Plaintiff complained of indigestion, a muscle in his back, fluid in his left ear, and a rib that he thought might be out of place. He requested something other than Bupropion (also called Wellbutrin, an antidepressant); however, the records appear to reflect that Bupropion was refilled (Tr. at 450).

On December 16, 2009, Brenda Sidwell, a social worker, noted that plaintiff had been referred by Dr. Novinger but was unable to stay for the consult (Tr. at 372, 436). "Attempted to contact patient by phone - pt unavailable - wife stated he was gone to school." The following day Ms. Sidwell tried to contact plaintiff by phone but there was no answer. Later that day she called again and spoke to plaintiff's wife who said plaintiff was attending school in Iowa to get his commercial driver's license. Ms. Sidwell asked to have plaintiff return her call (Tr. at 372, 436).

On December 21, 2009, plaintiff saw nurse Cynthia Mayberry (Tr. at 358, 414). He reported being irritable due to the holidays, and he said he was sleeping a lot so he would not get mad at others. His mental status exam was normal except his mood and affect were "down - depressed - irritated." He reported poor motivation and poor concentration. He reported frequent flashbacks with no elaboration, and he complained of back pain.

On January 5, 2010, plaintiff saw Brenda Sidwell, a social worker, after having been referred by Dr. Novinger (Tr. at 369). "Pt has a history of depression - sees Cindy Mayberry, NP, and takes Geodon (treats acute mania and schizophrenia). Recently released from prison for back child support. Pt states he is trying to acquire his CDL [commercial driver's license] so he can be a truck driver - feels he's doing okay at this time." Ms. Sidwell observed that plaintiff's affect was positive. He was assessed with depression and bipolar disorder. At the top of the form, it asks whether plaintiff had a positive depression screen, and "no" is circled.

34

On this day plaintiff was also seen by Joseph Novinger, D.O., for a medication follow up and for complaints of edema (Tr. at 370, 435, 448-449). Plaintiff weighed 347 pounds. He also said he had been taken off Prozac (also called Fluoxetine, an antidepressant) by Cindy Mayberry and started on Geodon which was causing increased sleepiness. Mild edema was observed. Plaintiff was assessed with only depression and edema. Furosemide (also called Lasix, a diuretic) was prescribed. His lab work showed blood glucose high at 122 (Tr. at 377).

On January 13, 2010, plaintiff was seen by nurse Cynthia Mayberry (Tr. at 357, 413). Plaintiff reported that "Geodon helped tremendously" in the morning, but then after four to six hours he was unable to stay awake. His mental status exam was normal, he had a happy mood. He said he worried all the time. He reported increased panic attacks.

On January 20, 2010, plaintiff was seen by nurse Cynthia Mayberry (Tr. at 356, 412). He was observed to have a casual appearance, a cooperative attitude, steady gait, normal speech, and linear thought process. He was taking Celexa (SSRI which treats depression) and 80 mg of Geodon per day.

On January 21, 2010, plaintiff was seen at Northeast Missouri Family Health Clinic for a dry scalp and for information about getting a CPAP[8] (Tr. at 433, 446-447). Plaintiff weighed 345 pounds. Plaintiff was assessed with obstructive sleep apnea, dry scalp, and erectile dysfunction. No psychiatric diagnoses were made. His chronic problems included "depressive disorder, not elsewhere classified."

On February 3, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 410). Plaintiff reported some frustration and irritability because a visit with his dad did not go as he had expected. His attitude was noted to be cooperative, gait was steady, speech normal, thought process linear, mood and affect were calmer, sleep was normal, motivation was improved,

---

[8]Continuous Positive Airway Pressure machine that treats sleep apnea.

concentration was improved, and energy was improved. He was having occasional flashbacks, but there was no elaboration. He was having no panic and no anxiety. He complained of a back ache. Ms. Mayberry conferred with Dr. Hardin who increased plaintiff's Celexa and started Minipress (for hypertension).

On February 26, 2010, nurse Cynthia Mayberry called plaintiff to do a phone medication check (Tr. at 409). Plaintiff reported an increased feeling of depression, but he said his Geodon was working OK. Plaintiff reported that food was his only pleasure. He was having no panic attacks. He reported frequent flashbacks, but there is no elaboration. Ms. Mayberry assessed bipolar disorder and posttraumatic stress disorder. She conferred with Dr. Hardin who discontinued plaintiff's Celexa (antidepressant) and started him on Cymbalta (treats depression and nerve pain).

On March 4, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 408). Plaintiff reported continuing to battle depression, which was related to the weather and his kids' moods. He was observed to have a cooperative attitude, steady gait, normal speech, linear thought process, depressed mood and affect. His motivation was improving as were his concentration and energy. He was having no panic, no anxiety. He reported frequent flashbacks, but there was no elaboration. Ms. Mayberry assessed bipolar disorder and posttraumatic stress disorder.

On March 8, 2010, plaintiff had a follow up with Joseph Novinger, D.O., on his CPAP (Tr. at 432, 444-445). He was noted to be tolerating it well, his wife said he had not been snoring and his fatigue seemed better. Plaintiff weighed 357 pounds. The record shows a diagnosis of weight gain "secondary to Geodon?" The record also includes diagnoses for obstructive sleep apnea, hypertension, and "depressive disorder, not elsewhere classified." He was told to follow up with nurse practitioner Cynthia Mayberry and to diet and exercise. His

36

concentration was improved, and energy was improved. He was having occasional flashbacks, but there was no elaboration. He was having no panic and no anxiety. He complained of a back ache. Ms. Mayberry conferred with Dr. Hardin who increased plaintiff's Celexa and started Minipress (for hypertension).

On February 26, 2010, nurse Cynthia Mayberry called plaintiff to do a phone medication check (Tr. at 409). Plaintiff reported an increased feeling of depression, but he said his Geodon was working OK. Plaintiff reported that food was his only pleasure. He was having no panic attacks. He reported frequent flashbacks, but there is no elaboration. Ms. Mayberry assessed bipolar disorder and posttraumatic stress disorder. She conferred with Dr. Hardin who discontinued plaintiff's Celexa (antidepressant) and started him on Cymbalta (treats depression and nerve pain).

On March 4, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 408). Plaintiff reported continuing to battle depression, which was related to the weather and his kids' moods. He was observed to have a cooperative attitude, steady gait, normal speech, linear thought process, depressed mood and affect. His motivation was improving as were his concentration and energy. He was having no panic, no anxiety. He reported frequent flashbacks, but there was no elaboration. Ms. Mayberry assessed bipolar disorder and posttraumatic stress disorder.

On March 8, 2010, plaintiff had a follow up with Joseph Novinger, D.O., on his CPAP (Tr. at 432, 444-445). He was noted to be tolerating it well, his wife said he had not been snoring and his fatigue seemed better. Plaintiff weighed 357 pounds. The record shows a diagnosis of weight gain "secondary to Geodon?" The record also includes diagnoses for obstructive sleep apnea, hypertension, and "depressive disorder, not elsewhere classified." He was told to follow up with nurse practitioner Cynthia Mayberry and to diet and exercise. His

36

oral medications were listed as Geodon (treats acute mania), Cialis (for erectile dysfunction), Furosemide (a diuretic), Zantac (antacid and antihistamine), Hydrochlorothiazide (for hypertension), and Lisinopril (for hypertension). Cymbalta (antidepressant) was started and Celexa (antidepressant) was discontinued.

On March 10, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 407). "Doing well, happy the whole week." Plaintiff's only problem was having gained 15 pounds in 3 weeks. He reported no pain in his body, and he was going to start exercising. His attitude was noted to be cooperative, gait was steady, speech was normal, thought process was linear, mood and affect were happy, sleep was OK, motivation was good, concentration was good, energy was good, he was having no panic, no anxiety, no flashbacks. He was told to discontinue Cymbalta due to weight gain and to start Lexapro (treats depression and anxiety). Ms. Mayberry assessed bipolar disorder and posttraumatic stress disorder.

On March 25, 2010, Michael Stacy, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 384-386). He found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

37

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to accept instructions and respond appropriately to criticism from supervisors

Dr. Stacy also completed a Psychiatric Review Technique finding plaintiff's mental impairment not severe, specifically 12.04 (affective disorders) and 12.06 (anxiety-related disorders) (Tr. at 387-397). He found that plaintiff had mild difficulties with activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. In support of his findings Dr. Stacy wrote as follows:

MER [medical record] indicates the claimant sought treatment for depression once in 9/07, where it was noted he had not made any appointments in some time. His affect was good and his mood was much improved. The claimant reported he was not feeling depressed and was quite hopeful about future. He was in the Department of Corrections from 1/09-8/09, but did not receive mental health services.

He was not seen again for mental impairments until 11/16/09 when he had an evaluation for the Division of Family Services. MSE [mental status exam] showed his speech to be normal, thought process was linear. . . . His short term memory was intact. . . . He returned to the same facility for treatment. His diagnosis was switched to Bipolar Disorder, but by an unqualified source. He is prescribed medications and was seen three times in 12/09 and 1/10. . . . In 1/10 he reported his panic attacks and obsessions had decreased and he noticed an increase in his motivation, concentration, and energy. In a 1/5/10 medical visit, he indicated he felt his depression was doing okay at this time. He reported he was trying to get his CDL license to become a truck driver.

ADLs indicate the claimant does not require any reminders for personal care. . . . [H]e is able to follow written instructions okay. . . . 3rd party ADLs indicated he has no difficulties with personal care, but does need reminders for medication. His motivation is decreased, but he is capable of completing chores and shopping. He is able to drive and go out alone.

Clmt's allegations are considered partially credible. Recent MSEs [mental status exams] have been essentially normal and there is some conflict between his and third party reports. With recent improvement, his mental impairments cause no more than mild to moderate functional limitations.

On March 25, 2010, plaintiff failed to show up for his appointment with Cynthia Mayberry (Tr. at 405). Plaintiff's application for disability benefits was denied on this day.

On April 8, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 404). Plaintiff had an improved week, was able to get out of bed more and enjoy his kids. He was observed to have a cooperative attitude, steady gait, normal thought process and speech, his mood and affect were calmer and less depressed. He had increased motivation, concentration and energy. He had decreased panic and anxiety. He reported occasional flashbacks but there was no elaboration. Ms. Mayberry diagnosed bipolar disorder and posttraumatic stress disorder, and she listed as a goal to increase plaintiff's Remeron (antidepressant) dosage.

On April 15, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 403). "Had another good week." Plaintiff had a "great visit" with his dad and brother, plaintiff had been fishing. His attitude was noted to be cooperative, his gait was steady, his speech was normal, his thought process was linear, his mood and affect were calm. His sleep was good, motivation

was good, concentration was good. He had no panic and no anxiety. He reported occasional flashbacks.

On May 11, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 402). Plaintiff's attitude was cooperative, his gait was steady, speech was normal, thought process linear, mood/affect was fluctuating. His sleep was good, his motivation was improving, his concentration was improving, his energy was improving. He was fully oriented with no panic, no anxiety. Flashbacks were apparently described as reminiscing. Overall pleasure came from "visiting with Mom." Plaintiff was taking Geodon (treats acute mania), Celexa (antidepressant), Remeron (antidepressant) and Minipress (for hypertension). Ms. Mayberry diagnosed bipolar disorder and posttraumatic stress disorder.

On May 18, 2010, plaintiff went to Blessing Hospital complaining of bipolar disorder and depression (Tr. at 471-486). He described his depression as moderate but said he was having suicidal ideation (Tr. at 472, 473). He also reported compulsive eating, indicating that he had gained 100 pounds over the past year (Tr. at 472). He denied headache and problems with urination (Tr. at 472). On exam he was fully oriented, his gait was normal, his extremities were nontender with normal range of motion and no pedal edema (Tr. at 473). He complained of lumbar pain (Tr. at 473). His entire physical exam was normal (Tr. at 473). During his psychiatric exam, plaintiff's chief complaint was "life" (Tr. at 482). Plaintiff reported suicidal ideation with no plan or intention (Tr. at 482). "Reports anger, unable to find a job, feeling hateful because he has no options in his life. He is unemployed. He went to prison for back owed child support, and served an eight-month sentence. His ex-wife pressures him, and he is afraid of having to go back to jail." (Tr. at 485). Plaintiff reported being treated for bipolar disorder by nurse Cynthia Mayberry (Tr. at 482). He said that Lexapro (treats depression and anxiety) did work when he took it (Tr. at 482). No edema was

40

observed (Tr. at 483). A mental status exam was performed (Tr. at 483). He had a disheveled mood, dysphoric (sad) affect. His memory, attention, registration and concentration were intact. He denied hallucinations and delusions. Insight and judgment were fair (Tr. at 483). Lexapro was prescribed (Tr. at 483). "The patient has been admitted to the BMS unit where he makes really little effort to participate in activities in the unit. He works on depression on his own with his therapist. Under the direction of this therapist, Joe Mercurio, the patient appears to gain benefit from the treatment alternatives. At the time of discharge, he is more hopeful and positive about the future. Denies suicidal or homicidal ideas, plans or intentions." (Tr. at 485).

Plaintiff was discharged on May 25, 2010, with an appointment to follow up with Bill Norton on June 1, 2010 (there are no records of any visit with Bill Norton or dated June 1, 2010) (Tr. at 475, 477). At discharge, his mood was normal, his attitude was cooperative, his affect was appropriate, his speech was normal, his motor activity was relaxed and calm, and he was fully oriented (Tr. at 475). His judgment was intact, his insight was intact, his thought processes were logical and organized, and there was no evidence of delusions or hallucinations (Tr. at 475). The only difference between his condition on admission and on discharge was that on admission his mood was depressed, his judgment was minimally impaired, and his insight was limited (Tr. at 475). On admission he had a "slight" risk of suicide; on discharge there was no risk of suicide (Tr. at 475). His discharge diagnoses were (1) major depressive disorder, recurrent, severe without psychotic features, and (2) dependent personality disorder (Tr. at 475). That, coupled with chronic life maladjustment, legal conflicts, on probation/parole, financial problems and relationship conflict resulted in a GAF of 31-40[9] and

_____

[9]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,

41

a stress rating of "moderate" (Tr. at 475). However, by the time he was discharged, his GAF was assessed at 50[10] (Tr. at 485).

On July 12, 2010, plaintiff was seen by Joseph Novinger, D.O., with complaints of numbness in the right leg occurring intermittently (Tr. at 504-505). Plaintiff reported edema, but on exam it was noted that "edema seems improved" although it was noted to be present (Tr. at 504, 505). Plaintiff weighed 377 pounds. He was assessed with edema and depression. His Furosemide (diuretic) was noted to be prescribed at 40 mg twice a day. Dr. Novinger ordered lab work.

On July 23, 2010, plaintiff was seen by Joseph Novinger, D.O., with complaints of anxiety (Tr. at 509-510). Plaintiff weighed 356 pounds. Dr. Novinger increased plaintiff's Zoloft (antidepressant) and added Buspar (treats anxiety).

On September 1, 2010, plaintiff saw Joseph Novinger, D.O., with complaints of back pain, depression, shortness of breath and nightmares (Tr. at 511-513). Plaintiff said the muscle relaxers were wearing off too soon. As far as depression, "feels that Buspar is working but could be better." On exam by Lisa Speaks, LPN, noted that plaintiff had no edema; however, Dr. Novinger observed "trace" edema on plaintiff's ankles. He weighed 368 pounds. Dr. Novinger increased plaintiff's Buspar for anxiety, he increased Prazosin for nightmares, and prescribed Naproxin (non-steroidal anti-inflammatory) for somatic dysfunction of the lumbar spine.

---

depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[10]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On September 14, 2010, plaintiff went to the Northeast Regional Medical Center with complaints of chest pain which resolved after admission (Tr. at 495-501). Plaintiff had been doing yard work (Tr. at 497). When the symptoms were at their worst, plaintiff felt like his chest was fluttering and he felt dizzy. He said this had also happened the day before and three weeks earlier. "The patient states that all 3 times this has occurred while he has been doing yard work. He does state that it seems to be worse when he is active. He states that after the events he has rested and this has improved his symptoms." (Tr. at 497). Plaintiff said he was not working and was trying to get disability "for his mental issues" (Tr. at 497). On admission plaintiff's blood pressure was normal and he was "chest pain free." During a review of systems, plaintiff said he "has noticed he has been going to the bathroom a little bit more often." (Tr. at 498). He reported some generalized joint aches worse in the legs, knees and hips. He denied muscle weakness. On exam no edema was noted (Tr. at 498). Range of motion and strength in all extremities was normal (Tr. at 499). He was fully oriented, his judgment and memory were intact and normal, mood and affect were also normal (Tr. at 499). EKG was negative, and enzymes were negative. The following day he underwent a cardiac catheterization which was also negative. His discharge paperwork shows he was currently taking Metoprolol (for hypertension), Norvasc (for hypertension), Lisinopril (for hypertension), Prazosin (also called Minipress, for hypertension), Sertraline (also called Zoloft, an antidepressant), Lasix (diuretic) as needed for weight gain greater than 3 pounds in a 24-hour period, Buspirone (also called Buspar, for anxiety), Prilosec (for heartburn), Geodon (treats acute mania), and Methocarbamol (also called Robaxin, a muscle relaxer) as needed for pain.

On September 22, 2010, plaintiff saw Joseph Novinger, D.O., in follow up from his hospital visit (Tr. at 514-516). Plaintiff weighed 374 pounds. No edema was present.

Case 5:15-cv-06020-REL   Document 17   Filed 03/17/16   Page 43 of 97

Plaintiff's physical exam was normal. Plaintiff was assessed with chest pain. He was told to resume activities cautiously and was given a prescription for Nitrostat (nitroglycerin, treats chest pain) and told to use it at the first sign of an attack of chest pain.

On September 28, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 280, 284, 522). Plaintiff said he would have come back sooner but his wife would not let him. "Having to make big decisions." His behavior and appearance were casual, attitude was cooperative, gait was steady, thought process linear, mood and affect were calm, he had been having decreased appetite, he was sleeping OK with his medications, his motivation was improving. He reported that his concentration was poor and his energy was "not too good." He reported having panic or anxiety "once in a while." He was assessed with bipolar disorder, posttraumatic stress disorder, alcohol dependency in remission, and generalized anxiety disorder with panic attacks. He was told to come in for bi-monthly follow up appointments.

Ms. Mayberry completed a Medical Source Statement Mental that same day (Tr. at 487-490). She found that plaintiff had no restriction in his ability to understand, remember or carry out simple instructions, and he had no restriction in his ability to make judgments on simple work-related decisions. She found that he had marked limitation in his ability to understand, remember and carry out complex instructions and in his ability to make judgments on complex work-related decisions. She found that plaintiff had no difficulty interacting appropriately with the public, supervisors or co-workers, but that he was extremely limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. When asked to identify the factors, e.g., the particular medical signs, laboratory findings, or other factors that support her assessment, Ms. Mayberry wrote:

> On DSM-IV has maj Depression (Bipolar) which affects ability to get to work, stay at work and deal with changes in routine. Has extreme anxiety which affects ability to be

44

around others. Doesn't respond in anger but has to leave the situation. (Used to have more problems with anger when younger). Meds help control the anger. Can't go to the store, be around others at kids' functions or work setting. Has panic attacks & has to leave. Can't tolerate any change in routine. Also has extreme difficulty with focus.

She also noted that "On DSM-IV has General Anxiety Disorder with Panic Attacks."

On September 30, 2010, plaintiff's first administrative hearing took place.

On October 7, 2010, plaintiff saw Robert Schneider, D.O. (Tr. at 852-853). Plaintiff complained of back pain for the past four years. "He states his pain is worse when he works, especially when he leans over and does weed-eating." Plaintiff described his pain as an 8 out of 10 in severity. His current pain medications were Robaxin (muscle relaxer) and Naprosyn (non-steroidal anti-inflammatory). Plaintiff said that since he is unemployed, he essentially lies around most of the time not doing anything. Plaintiff had good strength in both of his legs, straight leg raising was negative. He was described as pleasant and cooperative. He was assessed with morbid obesity, chronic back pain, thoracic spine dysfunction, lumbar spine dysfunction and left rib dysfunction. Osteopathic manipulative treatment was provided and hot packs were applied. X-rays of his lumbar spine showed only mild facet degenerative changes at the L4-L5 and L5-S1 levels and mild degenerative disk disease at L5-S1 (Tr. at 493, 854-858). Dr. Schneider recommended exercises, back stretching, improved posture, and a daily walking routine.

On October 20, 2010, plaintiff saw Joseph Novinger, D.O., for a one-month follow up on chest pain (Tr. at 517-519). Plaintiff denied fatigue. He weighed 364 pounds. On exam no edema was present. He was assessed with angina, stable; anxiety state unspecified, stable; and hypertension.

On October 26, 2010, plaintiff saw nurse Cynthia Mayberry (Tr. at 279, 283, 521). He said he had left his wife but was able to see his kids, "is feeling calm & happy. . . . feels everyone better off." She observed that his behavior was casual, his attitude was cooperative,

his gait was steady, thought process was linear, mood and affect were noted to be "happy," his appetite was "improving," motivation was good, energy was improving somewhat, he was having no nightmares or flashbacks, had "a little" panic/anxiety attack the day before. No abnormal findings or observations were noted, yet Ms. Mayberry assessed a GAF of 43.[11]

On March 14, 2011, the ALJ found plaintiff not disabled. There are no medical records from October 26, 2010, through January 13, 2012 -- more than 15 months.

On January 13, 2012, plaintiff saw Joseph Novinger, D.O., for a follow up (Tr. at 743-746). Plaintiff reported difficulty falling asleep, "worse at night," and said he was not able to get in to see Cynthia Mayberry until March. He complained of a "light burning" pain in his middle and lower back. He had lost his health care insurance and apparently was not able to use his CPAP as a result. Plaintiff reported restlessness but denied fatigue. In a screening questionnaire plaintiff reported depressed mood, difficulty concentrating, difficulty initiating sleep, feelings of guilt and diminished interest or pleasure. Based on this, Lorinda Acton, LPN, recommended Dr. Novinger consider a diagnosis of major depressive disorder. Plaintiff weighed 347 pounds. No edema was present. Plaintiff was fully oriented. "The patient is negative for anhedonia (inability to feel pleasure), is not agitated, is not anxious, does not have pressured speech, and does not have suicidal ideation. The patient does not demonstrate the appropriate mood or affect. The patient is depressed." Plaintiff had been off his psychiatric medications for the past year. Dr. Novinger assessed depressive disorder not elsewhere classified. He prescribed Zoloft (antidepressant) and Geodon (treats acute mania) 40 mg. and ordered lab work.

---

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On January 30, 2012, plaintiff saw Joseph Novinger, D.O., to follow up on lab tests (Tr. at 740-742). Plaintiff's fatigue was "better now [that] he is on the Geodon and Zoloft." Plaintiff reported increased upper back pain in addition to depressed mood, difficulty concentrating, difficulty going to sleep and feelings of guilt. He said he needed a new CPAP machine. Jessica Coffman, LPN, recommended that Dr. Novinger consider a diagnosis of major depressive disorder based on a questionnaire completed by plaintiff. Plaintiff weighed 350 pounds. Dr. Novinger assessed low back pain and prescribed Tramadol (narcotic like pain reliever). He assessed unspecified sleep apnea and told plaintiff he would try to get him a CPAP without having to repeat the sleep study. He assessed depressive disorder not elsewhere classified.

On February 27, 2012, plaintiff saw Kelly Freeland, a nurse practitioner, and Dr. Novinger for back pain and depression (Tr. at 736-739). Plaintiff complained of lower back pain and said the Tramadol was not working. Ms. Freeland wrote:

> The patient reports functioning as extremely difficult. The patient presents with depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, fatigue, feelings of guilt and loss of appetite but denies restlessness or thoughts of death or suicide. The patient's risk factors include financial worries, history of depression, history of suicidal attempts, relationship problems, social isolation and unemployment. The depression is aggravated by conflict or stress, lack of sleep, social interactions and traumatic memories. Additional information: Spoke with wife who he is separated from since Oct. 2011 and that just got out of drug treatment and they had a misunderstanding and now his depression is worse.

Based on a questionnaire completed by plaintiff, Jessica Coffman, LPN, recommended Dr. Novinger consider a diagnosis of major depressive disorder. Plaintiff weighed 342 pounds. No edema was present. Dr. Novinger assessed depressive disorder not elsewhere classified. He increased plaintiff's dose of Geodon to 120 mg per day and increased his dose of Clonazepam (for anxiety). He prescribed Prazocin for nightmares. He assessed "anxiety state" and unspecified backache. Plaintiff was counseled by Brenda Sidwell, a social worker, on

community resources. Ms. Sidwell wrote, "Pt. living with his mother, has no job, no money and is to move out of trailer next month. Unable to find housing, has a debt with HUD and is a felon. Pt does not know what to do. Is to see probation officer this week. Pt applying for disability. May have to go back to prison. . . . Discussed housing options and work options. Pt is to look for housing and job. Suggested his mother pay back to HUD. Pt to apply for jobs from list compiled." No barriers to learning were identified.

On March 14, 2012, plaintiff saw nurse Cynthia Mayberry for an initial intake evaluation (Tr. at 763-764). Plaintiff reported that his Medicaid was taken away and he was "soon to be homeless." Plaintiff reported extreme difficulties with loneliness since separating from his wife and not being able to see his kids. Ms. Mayberry observed that plaintiff was fully oriented, his gait was steady, speech was normal, thought process was "racing/bouncing," mood was depressed, affect was anxious. Plaintiff reported low energy, low motivation, and problems concentrating. He said he was having nightmares and flashbacks and some panic and anxiety. Ms. Mayberry recommended decreasing Geodon in the morning because plaintiff was sleeping too much.

On March 23, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 762). Plaintiff reported high anxiety and depression and said that he had gone back on his medications. Ms. Mayberry used hypnosis to help plaintiff release negative emotions. She assessed posttraumatic stress disorder and bipolar disorder.

On April 3, 2012, plaintiff saw Joseph Novinger, D.O., for a follow up (Tr. at 733-735). Plaintiff complained of gradual onset of pain in his back without injury. He weighed 353 pounds. He was fully oriented and demonstrated appropriate mood and affect. Plaintiff was diagnosed with a rash and was told to return for removal of skin tags.

48

On April 11, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 761). "Doing better since hypnosis but continues going back to wanting someone or something to rescue him." Ms. Mayberry assessed posttraumatic stress disorder and bipolar disorder.

On April 24, 2012, plaintiff saw Joseph Novinger, D.O., for a skin lesion and "chronic conditions" (Tr. at 730-732). Plaintiff had stopped taking Lisinopril (for hypertension) about two weeks earlier, and he noted that his Geodon had been changed by Cynthia Mayberry to 100 mg per day. Plaintiff weighed 353 pounds. Skin tags were removed. He was assessed with "depressive disorder, not elsewhere classified, improved mood and coping better with stressors."

On May 7, 2012, plaintiff saw Joseph Novinger, D.O., complaining of back pain and a rash (Tr. at 727-729). Plaintiff weighed 346 pounds. He had tenderness in his thoracic spine. Plaintiff was assessed with insect bite; "somatic dysfunction, thoracic region;" depressive disorder not elsewhere classified, improved; and unspecified sleep apnea.

On May 8, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 760). "Doing much better. Life has fallen in place for him. Working on house and has a place to live." Ms. Mayberry assessed bipolar disorder, posttraumatic stress disorder, and panic disorder.

On May 16, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 759). "Life has been going fairly well."

On May 25, 2012, plaintiff saw nurse Cindy Mayberry for therapy (Tr. at 758). Plaintiff reported feeling somewhat better and finding some peace. Ms. Mayberry used hypnosis "to bring calm & peace at subconscious level."

49

On June 11, 2012, plaintiff saw Joseph Novinger, D.O., for a follow up from an emergency room visit[12] (Tr. at 724-726). "Pt here for ER follow up after a horse fell on him on 6/7/12 and went to the ER in Milan on 6/8/12." Plaintiff reported increased pain under his left breast with associated pain when trying to breathe. Plaintiff denied depressed mood. He denied diminished interest or pleasure. Plaintiff's respiratory and cardiac exam was normal. He was noted to have tenderness in the right chest wall. Plaintiff was told to take Naproxen (non-steroidal anti-inflammatory) and if that did not work then he was to take Hydrocodone (narcotic).

On June 13, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 757). "Doing better - letting go of ex-wife. Focusing on his life and his future." Ms. Mayberry used hypnosis to bring calm and peace at a subconscious level.

On June 28, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 756). "Feeling good most of the time. . . Loving his work & enjoying having mom with him. Enjoying the outdoors."

On July 6, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 755). Plaintiff was doing better. Ms. Mayberry used hypnosis for bring subconscious level of calm and peace.

On July 27, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 754). Plaintiff reported having nightmares and worrying about his ex wife. Ms. Mayberry observed that plaintiff's attitude was cooperative, gait steady, speech normal, thought process and mood/affect were slightly anxious, his motivation was OK, concentration was OK, energy was OK. Panic and anxiety were "rare."

---

[12]The records from this emergency room visit are not a part of this record.

On August 6, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 753). Plaintiff had recently moved and was missing his horses and farm. He reported worrying about running into his ex-wife. Ms. Mayberry assessed posttraumatic stress disorder and bipolar disorder and recommended weekly to bi-monthly follow up sessions.

On September 18, 2012, plaintiff saw Joseph Novinger, D.O., with complaints of musculoskeletal pain and anxiety (Tr. at 720-723). Plaintiff complained of pain under his shoulder blades, relieved by lying flat on his back. He requested a referral to a spinal specialist. "The patient reports functioning as very difficult. The patient presents with decreased need for sleep, difficulty falling asleep, fatigue, racing thoughts and restlessness but denies depressed mood or diminished interest or pleasure. The patient's risk factors include financial worries, history of depression, history of suicidal attempts, relationship problems, social isolation and unemployment. The anxiety is aggravated by lack of sleep. The anxiety is associated with chronic pain (back pain)." Plaintiff weighed 373.8 pounds. No edema was present. Plaintiff was fully oriented with appropriate mood and affect. Plaintiff was diagnosed with depressive disorder, not elsewhere classified, and insomnia. His Geodon (treats acute mania) was increased to 60 mg twice a day and he was told to see Cynthia Mayberry. Plaintiff was counseled by Brenda Sidwell, a social worker, on reassessment. Plaintiff told Ms. Sidwell that he "sleeps from 7 am - 3 pm feels anxious at pm. Was seeing Cindy M. not lately. Gets up in middle of pm and talks to ex-wife on phone. States not doing much, sitting or laying around camper - little activity." Ms. Sidwell recommended that plaintiff skip sleeping during the day so he can try to get his sleep schedule turned back around. She also recommended he cut down on sweetened drinks and drink more water.

On October 2, 2012, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 752). She observed that his attitude was cooperative, gait steady, speech normal, thought process

linear, mood and affect were calmer, motivation was OK, concentration was OK, energy was OK, and he reported occasional flashbacks. He said he was having anxiety at night and difficulty sleeping. He reported "walking, enjoy [the] day today". Ms. Mayberry recommended that plaintiff's Geodon be increased to 80 mg in the evening.

On October 5, 2012, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine after having been referred by Dr. Novinger (Tr. at 796-801, 822-825). Plaintiff complained of back pain which began a long time ago. "I can't exercise therefore I have gained a lot of weight. I can't work hard to socialize." Plaintiff described his pain as a 10 out of 10 in severity. Plaintiff reported that he was walking daily. He denied headaches. On exam plaintiff had tenderness and muscle spasm in his back. His gait was normal. No edema was present. Plaintiff's mood and affect were normal. Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was assessed with lumbago (low back pain).

On October 12, 2012, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 791-795, 826-829, 851). He complained of lower back pain and pain in his ankles and balls of his feet. He denied headaches and problems with urination. He described his pain as an 8 out of 10 in severity. "OMT [osteopathic manipulative treatment] and continued stretching did resolve mid thoracic pain. Low back and right foot still bothering him. Requested something stronger for pain than he is currently prescribed by another physician (I said I would not prescribe anything at this time)." Plaintiff's gait was normal. He had tenderness in his lumbar spine and muscle tightness in his back. Edema was present. His memory was intact, his mood and affect were appropriate. Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was assessed

52

with low back pain and ankle/foot pain. He was encouraged to exercise, lose weight, and walk.

On November 13, 2012, plaintiff saw Joseph Novinger, D.O., with complaints of blurry vision and a skin lesion (Tr. at 717-719). Plaintiff denied depressed mood. He denied diminished interest or pleasure. A depression screening was negative. Plaintiff weighed 391 pounds. No edema was present. Plaintiff was fully oriented with appropriate mood and affect. Blood work was ordered.

On November 16, 2012, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 786-790, 830-833, 850). Plaintiff weighed 374 pounds. He complained of pain in his lower back, right hip and ankle. He reported recent headaches but no difficulties with urination. Plaintiff described his pain as a 9 out of 10 in severity. "Has had low back pain for years, but worse the last two weeks after a trip." Plaintiff had tenderness in his spine and muscle spasm in his back. He had full range of motion in both knees and ankles. Gait was normal. Edema was present. "The patient is oriented to time, place, person, and situation. The patient is negative for anhedonia, is not agitated, is not anxious, behaves appropriately for age. The patient demonstrates the appropriate mood and affect." Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was assessed with low back pain, ankle/foot pain, hip pain, and morbid obesity. "Encouraged to eat carrots in between each cookie, continue to exercise as that has positive influence on mood." Plaintiff was told to continue walking for exercise.

On January 4, 2013, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 781-785, 849). He complained of pain in his lower back and under his shoulder blades. This pain had been present for a while. Plaintiff denied headaches or problems with urination. He said he exercises daily. Edema was present. Plaintiff had

tenderness in his back. His balance and gait were normal and he demonstrated appropriate mood and affect. Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was assessed with low back pain, ankle/foot pain, and muscle spasm. He was told to continue exercising.

On February 4, 2013, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 834-837). Plaintiff complained of back pain which he rated a 7 out of 10 in severity. Plaintiff reported exercising daily. He had tenderness in his back and mildly reduced range of motion in his pelvis. Edema was present. Plaintiff's balance and gait were normal, his mood and affect were appropriate. Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was diagnosed with low back pain, muscle spasm, and ankle/foot pain "asymptomatic." Plaintiff was told to continue exercising.

On February 19, 2013, plaintiff saw nurse Cynthia Mayberry for counseling (Tr. at 751). Plaintiff reported that he had found some peace. Ms. Mayberry observed that plaintiff's attitude was cooperative, his gait was steady, speech was normal, thought process was "racing, bouncing," his mood was anxious, his appetite was "too good," his sleep was OK, his motivation was improved, concentration was improved, energy was improved, and flashbacks were rare. She assessed posttraumatic stress disorder, bipolar disorder, generalized anxiety disorder with panic. She told plaintiff to come in bimonthly for therapy.

On March 4, 2013, plaintiff saw Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 776-779, 838-841, 848). He complained of lower back pain which started "long ago." Plaintiff was asked if he had had headaches recently and he said, "no." He also denied any problems with urinating. Plaintiff described his back pain as a 10 out of 10 in severity. Plaintiff said he had not been exercising due to the cold weather and losing strength in his back. On exam plaintiff had tenderness in his back and knees, and positive muscle

54

spasm in his back. Edema was present. His gait was normal, mood and affect were normal. Osteopathic manipulative treatment was performed which improved plaintiff's symptoms. He was assessed with low back pain and was told to do exercises and lose weight.

On March 18, 2013, plaintiff saw Kelly Freeland, a nurse practitioner, for swelling, shortness of breath and medication refills (Tr. at 714-716). Ms. Freeland observed swelling in plaintiff's ankles. He said he had cut out all added salt, but continued to consume food with salt already in it. He had not taken Furosemide (also called Lasix, a diuretic) in several years. Plaintiff reported increased shortness of breath with activity but denied chest pain. He requested a prescription for narcotic pain medication. Plaintiff denied depressed mood. He denied diminished interest or pleasure. He weighed 429 pounds. He was fully oriented, he had normal insight, normal judgment, appropriate mood and affect. Lasix (diuretic) was prescribed. Plaintiff was told to keep his legs elevated and return the following week for a follow up. He was also given a prescription for narcotic pain medication.

On March 22, 2013, plaintiff saw nurse Cynthia Mayberry for counseling (Tr. at 750). Plaintiff reported that he was doing better.

On April 16, 2013, plaintiff saw nurse Cynthia Mayberry for counseling (Tr. at 749). He was very distraught about not being able to have contact with his kids. Ms. Mayberry assessed posttraumatic stress disorder, bipolar disorder and panic disorder, and told plaintiff to return for monthly follow up appointments.

On May 13, 2013, plaintiff was seen by Charles Lehnardt, D.O., at Osteopathic Manipulative Medicine (Tr. at 771-775, 842-845, 847). Plaintiff complained of low back pain (gradual onset without injury), knee pain (gradual onset about three months earlier) and ankle pain (sudden onset 25 years ago). Plaintiff said his back pain was aggravated by changing positions and walking, his knee pain was aggravated by movement and walking, and

his ankle pain was aggravated by walking. "Additional information: No reason for left knee pain. Otherwise feels well. [Ankle pain] is stopping him from exercising as much as he would like." Plaintiff reported that he exercises daily. He weighed 429 pounds. He denied headaches. On exam plaintiff had tenderness in his lumbar spine but none in the thoracic or cervical spine, and he had paravertebral muscle spasm. His gait was normal. Plaintiff had tenderness in his left knee and pain in his right ankle but full range of motion. Edema was present on both legs. Plaintiff demonstrated appropriate mood and affect. Osteopathic manipulative treatment was performed which resulted in improved symptoms. Dr. Lehnardt assessed low back pain, ankle/foot pain, somatic dysfunction in the sacral and pelvic regions and lower extremities, and morbid obesity. Plaintiff was told to do exercises for his back. "Encouraged to continue improved diet, exercise, reasonable goal is to weigh 180 in 2 1/2 years."

On June 7, 2013, plaintiff saw Joseph Novinger, D.O., for a follow up (Tr. at 804-807). Plaintiff requested a refill of his narcotic pain medication. "The patient reports functioning as extremely difficult. The patient presents with depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, fatigue and feelings of guilt but denies loss of appetite, restlessness or thoughts of death or suicide. The patient's risk factors include financial worries, history of depression, history of suicidal attempts, relationship problems, social isolation and unemployment." Based on a questionnaire completed by plaintiff, Heather Hammons, LPN, recommended Dr. Novinger consider a diagnosis of major depressive disorder. Plaintiff weighed 431 pounds. Plaintiff's physical exam was normal, no edema was present. Plaintiff was "not agitated, is not anxious, does not have pressured speech". Plaintiff appeared depressed. "Plan is that he will continue to walk 2 miles qod [every other day]." A weight loss support group was recommended. Because plaintiff had transportation problems, he was

56

given information about the OATS bus. He was given information about workshops for healthy living. He was assessed with depressive disorder not elsewhere classified. His Zoloft was increased. A prescription for narcotic pain medicine was provided. Plaintiff saw Jennifer Jackson during this visit, and she noted, "patient really struggling with depression due to not being able to see 4/6 of his kids, going through divorce, weight loss struggles, recommended weight loss support group."

On June 10, 2013, plaintiff saw nurse Cynthia Mayberry for therapy (Tr. at 813). "Has been doing much better since the weather is better. Has begun walking. Stuck on being able to see kids now."

On July 13, 2013, plaintiff had x-rays of his left knee which showed mild to moderate degenerative changes (Tr. at 916-917). X-rays of his right ankle showed degenerative changes (Tr. at 918-919).

On August 14, 2013, Judge Noce reversed the decision of the Commissioner and remanded for further consideration.

On September 21, 2013, plaintiff went to the emergency room by ambulance due to abdominal pain that had started three days earlier (Tr. at 862-885). During a review of systems plaintiff reported urinary frequency and mid back pain. On exam plaintiff was noted to have mild back pain, mild CVA tenderness on the left. Plaintiff weighed 419 pounds. Plaintiff described his pain as a 9 out of 10 in severity. "Noted to be grimacing, moaning, restless." He had blood in his urine and it was determined he had a kidney stone.

On September 23, 2013, nurse Cynthia Mayberry completed a Medical Source Statement Mental (Tr. at 612-614, 819-821). She found that plaintiff has mild restriction in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. She found that he has marked restriction

57

in the ability to make judgments on complex work-related decisions, interact appropriately with supervisors and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. She found that he has extreme restriction in his ability to understand, remember and carry out complex instructions and his ability to interact appropriately with the public. When asked to identify the factors, "e.g., the particular medical signs, laboratory findings, or other factors" that support her assessment, Ms. Mayberry wrote, "Lewis has been in for treatment since 2008. He is unable to make since [sic] appts. due to low self esteem -- and not wanting others to see him. His anxiety is extremely high, can't get out of bed and moving some days due to his depression." When asked whether other capabilities are affected by his impairment, Ms. Mayberry wrote, "Depression - unable to get out of bed. Anxiety - can't get out of the house." The medical signs and laboratory findings that support her assessment were listed as "same as above." Ms. Mayberry found that plaintiff would likely miss four or more days of work per month and that he would be off task and that his symptoms would likely be severe enough to interfere with his attention and concentration needed to perform even simple work tasks 25% or more of the time.

On October 9, 2013, plaintiff filled a prescription for Furosemide (also called Lasix, a diuretic) for the last time (Tr. at 1216-1223). These records go through August 5, 2014 (Tr. at 1223).

On November 13, 2013, plaintiff saw nurse Cynthia Mayberry (Tr. at 1262). Plaintiff was worrying nonstop about his kids. "He hasn't been able to see other kids because his wife is upset with him about a decision he made with their son." Ms. Mayberry provided therapy; diagnosed bipolar disorder, panic disorder without agoraphobia, and posttraumatic stress disorder; and she recommend he return in a month. "Discussion of how more frequent appts. might help with functioning."

58

On November 22, 2013, plaintiff saw Joseph Novinger, D.O., for a men's preventative visit (Tr. at 886-889). Plaintiff had stopped taking Lasix a month ago. He requested a refill of narcotic pain medication. Plaintiff denied depressed mood. He denied diminished interest or pleasure. He weighed 448 pounds. No edema was present. He demonstrated appropriate mood and affect, and he was fully oriented. "Has gained 100 lbs in past 1.5 years. Discussed diet, and exercise as possible. He can discuss with mental health provider as far as any med alternatives that would effect [sic] his weight less." He was assessed with chronic pain syndrome and his narcotic pain medication was refilled. Also listed as "problems discussed today" was bipolar disorder, unspecified. There was no elaboration and it is unclear whether this was a diagnosis. Plaintiff also saw Brenda Sidwell, a social worker, who noted "Pt reports unable to walk because of the weather and pain; discussed meal preparing and says mother fixes biscuits and gravy; bread but is going to try to add more fruits and vegetables; wants to walk at the health and fitness center; boredom leading to sleep during the day." Ms. Sidwell discussed things plaintiff can do during the day to increase his physical activity and lose weight. Barriers to learning included "motivation and boredom."

On December 13, 2013, plaintiff saw Joseph Novinger, D.O., for a follow up on lab work (Tr. at 890-895). His blood sugar had been worse on his last lab. Plaintiff said he had started a diet and had lost 7 pounds. He weighed 441 pounds. His depression screening was negative. His psychiatric exam was normal. "Bipolar disorder, unspecified" was listed under chronic conditions. The medication records show that Lasix was prescribed on November 25, 2013 -- approximately 2 1/2 weeks earlier -- however, his pharmacy records, as mentioned earlier, do not indicate this prescription was filled (Tr. at 891). Plaintiff was assessed with obesity, and was told to lose weight and follow a diet low in sugar and starch. He was assessed with bipolar disorder, unspecified, "seems well controlled." Barriers to learning included

59

motivation and boredom. Plaintiff met with Brenda Sidwell, a social worker, to talk about diet and exercise. "Pt states wants to lose weight, doesn't know what to do, doesn't want to increase fruits, difficult to exercise, doesn't want to have diabetes, doesn't leave his trailer much, mother fixes the meals - discussed cutting carbs, portions, doing some kind of activity daily." Plaintiff was given information on activities that are free in his community. He was told to cut portions, increase his vegetables, and get out of his home daily for physical activity.

On February 11, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1261). Plaintiff reported having reached out to his kids to try to improve his relationship with them. "He states he has established a relationship with his daughter in town and he talks with her about every night for an hour. . . He states he can go to Wal-Mart now without feeling like he is going to have a panic attack." Ms. Mayberry assessed bipolar disorder, panic disorder without agoraphobia, and posttraumatic stress disorder, and she recommended he return in one month.

On February 21, 2014, plaintiff saw Joseph Novinger, D.O., for cold symptoms (Tr. at 896-901). "Mood is stable. . . . Prefers to have hydrocodone [narcotic] and stop tramadol [narcotic-like pain reliever]." Plaintiff was given a prescription for narcotic pain medication. He weighed 461.8 pounds, which was 20 pounds heavier than when Dr. Novinger told him to lose weight due to high blood sugar two months earlier. Plaintiff's psychiatric exam was normal. Plaintiff was diagnosed with obesity, bipolar disorder unspecified, and hypertension. He met with Brenda Sidwell, a social worker, on weight management. Barriers to learning included motivation and boredom. Plaintiff's mother was present during the appointment and Ms. Sidwell talked to her about preparing healthy meals, less biscuits and gravy. Plaintiff's mother said that plaintiff eats a lot of snacks after his meals and he eats during the night. Plaintiff was told to walk more.

60

On March 12, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1259). "Lewis states he is feeling good within himself except he has some continuing anxiety and he is unable to sleep. He feels he would do well by going into Blessing Hospital for a week to get his sleeping patterns and medications regulated. He also feels the interaction with others will help him reset his patterns and help him move forward." Ms. Mayberry provided supportive therapy; diagnosed bipolar disorder, panic disorder without agoraphobia, and posttraumatic stress disorder; and she recommended he follow up in one month.

On April 4, 2014, plaintiff saw Joseph Novinger, D.O., for back pain (Tr. at 903-908). He requested a referral to a pain clinic. Plaintiff's depression screening was negative. He denied frequent urination. He denied feeling down, depressed or hopeless, he denied having little interest or pleasure in doing things. Plaintiff weighed 469 pounds. No edema was present. His physical exam was normal. His psychiatric exam was normal. Plaintiff was assessed with obesity and put on a more aggressive diet -- no sugar, no grain based foods. He was assessed with "bipolar disorder, unspecified - unable to come of [sic] Geodon it seems."

On April 11, 2014, plaintiff had x-rays of his thoracic spine which were normal except for a mild compression deformity at T12 unchanged from four years earlier (Tr. at 914). X-rays of his lumbar spine were normal and unchanged from four years earlier (Tr. at 915).

On April 15, 2014, plaintiff was seen at Preferred Family Healthcare (Tr. at 1231). The evaluation paperwork was signed by Sara Carmer, a social worker; Corrie Willis, a nurse practitioner; a caseworker, an LPN, and a supervisor (Tr. at 1252). Plaintiff stated that he started noticing his psychological problems when his estranged wife refused to let him talk to his step kids, who are like his own. The kids were in Texas. He also said the weather had been a problem (Tr. at 1232). His most recent suicidal thought occurred ten years earlier, in 2004 (Tr. at 1232). His mental health history dating back to 1998 was all for depression (Tr. at

61

1232).  With regard to the current state of his mental illness, he said, "It's okay as long as I'm on medications." (Tr. at 1232).  Plaintiff did not meet his father until plaintiff was 18 years old; his relationship with his mother was described as good (Tr. at 1233).  Plaintiff denied any abuse during his childhood (Tr. at 1233).  Plaintiff said he had an intentional motorcycle accident at age 18 due to being upset over a girlfriend breaking up with him (Tr. at 1234).  Plaintiff reported that he is independent with self care, for both physical and mental health (Tr. at 1234).  Plaintiff was living with his mother in a camper and described his living situation as calm and happy but not private (Tr. at 1235).  He had no problem maintaining the stability and cleanliness of his home, and he had been living in this situation for the past 2 1/2 years (Tr. at 1236).  He is able to make appointments and get to them consistently and on time (Tr. at 1237).  Plaintiff was $50,000 behind in child support, and he was living off his mother's disability income (Tr. at 1237-1238).  Plaintiff has six children (Tr. at 1255).  Plaintiff's last job was in 2008 for Adair Foods in September 2008; "he was arrested three weeks later for non-payment of child support." (Tr. at 1243).  When plaintiff was asked to list his current medications, he did not report taking a diuretic (Tr. at 1248).  Plaintiff reported that he does not go out and socialize because he is embarrassed about his weight (Tr. at 1249).  Plaintiff "reported" Bipolar I Disorder (Tr. at 1249).  His goals were to be less anxious and less self-conscious about his weight so he could get back to church and be out in the community (Tr. at 1250).  Plaintiff's GAF was listed as 42 (see footnote 11 on page 46).  He had major depression, physical problems and "limited resources, . . . unable to work, unable to financially support self, conflict separation with marriage, unable to pay child support, parole and prison." (Tr. at 1248).  The only service recommended was "community support services" -- there was no recommendation for group therapy, family counseling, health care services, housing services,

IDDT services, individual counseling, legal services, medication management services, or psychiatric rehabilitation services (Tr. at 1251).

That same day plaintiff met with Corrie Willis, a nurse practitioner (Tr. at 1253-1256). The nurse observed that plaintiff's gait was steady. His speech was regular. Plaintiff's complaints of inability to be outside, have energy, or do much of anything were all due to his excessive weight (Tr. at 1253-1254). The nurse observed that plaintiff's memory was intact (Tr. at 1254). This record reflects plaintiff's reports rather than any observations:

> His thought processes, he acknowledges having racing thoughts. He states his mind at night is always going. He reports at times thinking about the past. . . . The patient reports his mood is always an 8 on a 1 to 10 scale with 10 being the worst. . . . He reports that in the last three months he has had suicidal thoughts but without a plan or intent.[13] . . . His concentration he reports is poor. . . . He reports having obsessive thoughts and those things have to be done in even numbers. He purchases things in even numbers. He does not like odd numbers except for the number 7 which he feels is a good number and a lucky number. . . . He states his impulse control is poor. . . . He states he has had anger issues. . . .

(Tr. at 1253-1254).

> He has had multiple suicide attempts from overdoses. He tried to run his motorcycle into a ravine. He stated his first suicide attempt was at the age of 18. He was also at Mid MO for a suicide attempt in the last 90's. Some of these suicide attempts have been when breaking up with relationships. He states he does not do well when breaking up. He likes to be in relationships.

(Tr. at 1254).

> He states he was not abused by others. He states he has a lot of guilt and remorse for being the abuser. He states he has a lot of flashbacks of things that he has done that he regrets in his relationships.

(Tr. at 1256).

The nurse assessed major depression with suicidal ideations and panic disorder. His Axis IV assessment was "severe, limited resources, limited support systems, chronic health

---

[13]This is despite having reported during his initial interview that his last suicidal thought occurred in 2004 (Tr. at 1232).

issues, chronic pain, unable to work, unable to financially support self, conflicts, separation from current marriage, unable to pay his child support with parole and prison in the past, current weight of 469." (Tr. at 1256). The nurse recommended community psychiatric rehabilitation, continued medication management, and individual therapy with Cynthia Mayberry. The nurse told plaintiff to attend TOPS (Take Off Pounds Sensibly, a weight-loss support group) and Over Eaters Anonymous, which would require weekly meetings (Tr. at 1256).

On April 16, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1258). Plaintiff reported that he was doing somewhat better. "He states he chose to set up a CSW instead of going to the hospital after our last visit." Ms. Mayberry diagnosed bipolar disorder, panic disorder without agoraphobia, and posttraumatic stress disorder. She recommended that he return on a monthly basis.

On June 2, 2014, nurse Cynthia Mayberry completed a Medical Source Statement Mental (Tr. at 1264-1266). She found that plaintiff is moderately limited in his ability to understand, remember and carry out simple instructions and to make judgments on simple work-related decisions. She found he was extremely limited in his ability to understand, remember and carry out complex instructions, and that he was markedly limited in his ability to make judgments on complex work-related decisions. She found that he was markedly limited in his ability to interact appropriately with the public, supervisors or co-workers; and that he was extremely limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. "Lewis experiences such anxiety he has difficulty coming in for appts. even once a month. He is self-conscious sitting in the waiting room or walking into my office. He can't maintain eye contact although he appreciates the sessions and profusely thanks me every time." Ms. Mayberry found that plaintiff's impairments are likely to

64

produce good days and bad days, that he is likely to miss more than four days of work per month, and that he is likely to be off task with symptoms interfering with attention and concentration needed to perform even simple work tasks "25% or more" of the time. She found that plaintiff would need to take 2 to 3 breaks a day for a few minutes up to a half an hour each time due to panic attacks and anxiety.

On June 18, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1281). "Lewis states he is doing OK. He has started at PFH [Preferred Family Healthcare] and has enjoyed his worker but he is leaving somewhat anxious about the new person. He states he has been walking at the Y and feeling good about this - feeling he is making progress." Ms. Mayberry provided supportive therapy, her diagnoses were the same, and she noted that his medication was helping.

On July 30, 2014, plaintiff was evaluated at Preferred Family Healthcare by nurse Cynthia Mayberry (Tr. at 1267). "Pt reports 'I didn't have med for 1 month, incarceration & it was rough.' Pt states 'I felt alone in jail for 3 weeks, I was down & not wanting to try. I now feel like trying, it was a real help when CSS came to jail & visited - made me try a little harder.'" She noted that plaintiff's memory was intact, he was alert and oriented. He weighed 469 pounds and was observed to be well groomed. His gait was steady. She assessed major depressive disorder and panic disorder with a GAF of 40 (see footnote 5 on page 27). She noted that he had been off his medications while in jail but once he got out and restarted his medication, "pt states things going a lot better." She also noted that plaintiff's disability hearing was scheduled for August 18, 2014 -- in about 2 1/2 weeks. She told plaintiff to come back in six months for a follow up visit.

On August 13, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1280). "Lewis states he has signed himself into PFH. He was at his aunt's and uncle's where he felt very welcome

65

but wanted to be closer to where he could see his daughter. He and his mom had a falling out over his brother which has always been a contention in his life. He is surprised at himself and how well he is adapting to PFH and being around others. He has shaved and is losing weight." Ms. Mayberry's diagnoses remained the same, and she noted that plaintiff's medications were helping.

On August 21, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1279). "Lewis states he has been socializing with others at the facility and feeling better about himself. He feels it is good for him to be around others." Ms. Mayberry's diagnoses were the same. She noted that his medications were helping.

On August 25, 2014, plaintiff's administrative hearing was held.

On August 26, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1278). "Lewis had his disability hearing. He feels pretty good about the situation. His daughter has been coming to visit and she said she wants to live with him part-time. His son has also been coming to visit and his aunt." Ms. Mayberry provided supportive therapy and noted that plaintiff's medication was helping.

On September 4, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1277). "Lewis states he has been feeling content. He is socializing with the people at PFH and enjoying going on the outings. He is also beginning to feel comfortable in his own skin and like himself and his body. He had a great b-day with both of his daughters visiting him. He is enjoying others liking being around him and feeling stronger in who he is." Her diagnoses were the same. "Medication is helping - to maintain."

On September 10, 2014, plaintiff saw nurse Cynthia Mayberry (Tr. at 1276). "Lewis states he is doing better. He is thinking about going to live with his aunt and uncle - stating he can still go to groups and have a CSS worker visit him. He is no longer afraid of living by

66

himself but is enjoying being around others so he isn't wanting to at this time. He is wanting to begin exercising more and enjoys being out. He is looking forward to going to the zoo." Ms. Mayberry diagnosed bipolar disorder, panic disorder without agoraphobia, and posttraumatic stress disorder. She noted that his medication was helping. She recommended he come in for weekly appointments.

On October 28, 2014, the second ALJ found plaintiff not disabled.

## V.    DISTRICT COURT ORDER

On August 14, 2013, United States Magistrate Judge David Noce in the Eastern District of Missouri entered an order reversing the decision of the Commissioner and remanding for further consideration (Tr. at 1023-1067). The order states as follows:

> On remand the ALJ must consider and discuss plaintiff's evidence regarding the intermittent and alternating nature of plaintiff's mental condition and reconsider whether plaintiff qualifies under Listings 12.04 and 12.06. Further, the ALJ must reconsider plaintiff's evidence of headaches, edema, dizziness, and frequent urination, their effect on his RFC, and plaintiff's ability to perform work existing in significant numbers in the national economy.

Judge Noce agreed with the ALJ's finding that nurse practitioner Cynthia Mayberry's opinions that plaintiff's limitations were extreme was not supported by the record (Tr. at 1041). He remanded for further consideration as to whether plaintiff's allegations of suffering from depressive and manic episodes alternately and intermittently is credible and if so whether that would satisfy the B criteria in Listings 12.04 and 12.06 (Tr. at 1042-1043). "[T]he ALJ did not discredit plaintiff's testimony of the intermittent and alternating nature of plaintiff's mental condition nor does the ALJ's decision reflect meaningful consideration of the condition. Plaintiff's evidence may affect the ALJ's decision because determining the degree of mental limitations requires consideration of a claimant's ability to function on a sustained basis. Further, it would render a finding of marked limitation not inconsistent with plaintiff's abilities to perform chores, shop, drive, and leave his home alone." (Tr. at 1043).

Judge Noce also ordered the Commissioner on remand to address the issue of plaintiff's allegations of headaches, edema, dizziness, and frequent urination, noting that plaintiff did not include these "impairments" in his application for benefits but raised them during the administrative hearing (Tr. at 1044-1045).

## VI.   FINDINGS OF THE ALJ

Administrative Law Judge Carol Boorady entered her opinion on October 28, 2014 (Tr. at 524-543). Plaintiff's last insured date was June 30, 2010 (Tr. at 529).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 529).

Step two. Plaintiff suffers from the following severe impairments: degenerative disc disease of the thoracic and lumbar spine, sinus tachycardia, major depressive disorder, generalized anxiety disorder with panic, and obesity (Tr. at 530).

The following are nonsevere impairments: degenerative changes of the right ankle, hypertension, obstructive sleep apnea, headaches, edema, dizziness, frequent urination, and alcohol dependence in remission (Tr. at 530). The ALJ did consider these impairments in conjunction with one another and plaintiff's severe impairments when assessing plaintiff's residual functional capacity (Tr. at 531).

Because there is no substantial evidence in the record of documented mania, and no substantial evidence of documented traumatic events, plaintiff's alleged bipolar disorder and posttraumatic stress disorder are not medically determinable impairments (Tr. at 531-532).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 532-535).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except that he can lift up to 10 pounds occasionally and less than 10 pounds frequently; stand

68

or walk for 2 hours per day; sit for 6 hours per day; requires a sit/stand option every 30 to 60 minutes for a few minutes at a time while remaining at the work station; cannot climb ropes, ladders or scaffolds; cannot kneel, crouch, or crawl; can occasionally climb ramps and stairs, balance or stoop; should avoid concentrated exposure to temperature extremes, vibration and work hazards; can understand, remember and carry out simple to moderately complex instructions consistent with semi-skilled work; can tolerate occasional contact with coworkers and supervisors; can have no contact with the general public; can have no tandem tasks; and it would be best for him to work independently (Tr. at 535). With this residual functional capacity, plaintiff cannot perform his past relevant work (Tr. at 541).

Step five. Plaintiff was 39 years of age on his alleged onset date, which is defined as a younger individual (Tr. at 541). He is capable of making a successful adjustment to other work available in significant numbers, such as data examination clerk, dowel inspector, and surveillance system monitor (Tr. at 542). Therefore, plaintiff is not disabled (Tr. at 542-543).

## VI. LISTINGS 12.04 AND 12.06

The district court's remand order directed the ALJ to reconsider whether plaintiff qualifies under Listings 12.04 and 12.06 by addressing plaintiff's credibility and the evidence in the record of the specific factors enumerated in these listings.

Listing 12.04 pertains to affective disorders, including depressive and manic syndromes, and Listing 12.06 pertains to anxiety related disorders. 20 C.F.R. § 404, App. 1. Each Listing contains sets of criteria entitled A, B, and C, which a claimant must satisfy in various combinations to qualify. In the original federal appeal, plaintiff specifically challenged the ALJ's determination regarding the B criteria, which are identical for both Listing 12.04 and Listing 12.06.

To satisfy the B criteria, a claimant must show that he suffers at least two of the following:

1.      Marked restriction of activities of daily living,

2.      Marked difficulties in maintaining social functioning,

3.      Marked difficulties in maintaining concentration, persistence or pace,

4.      Repeated episodes of decompensation, each of extended duration.

The regulations[14] provide as follows:

1.      Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

2.      Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative,

---

[14]Plaintiff does not argue that he has suffered repeated episodes of decompensation, so I will not address that factor in this order.

or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

     3.       Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits. . . .

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

* * * * *

Need for longitudinal evidence. Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity.

* * * * *

Mental status examination. The mental status examination is performed in the course of a clinical interview and is often partly assessed while the history is being obtained. A comprehensive mental status examination generally includes a narrative description of your appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight. The individual case facts determine the specific areas of mental status that need to be emphasized during the examination.

71

20 C.F.R. § Pt. 404, Subpt. P, App. 1

 With that background, I turn to the ALJ's order, keeping in mind the directions of the district court on remand which include the following:

> [T]he ALJ did not discredit plaintiff's testimony of the intermittent and alternating nature of plaintiff's mental condition nor does the ALJ's decision reflect meaningful consideration of the condition. . . .  On remand the ALJ must consider and discuss plaintiff's evidence regarding the intermittent and alternating nature of plaintiff's mental condition and reconsider whether plaintiff qualifies under Listings 12.04 and 12.06.

(Tr. at 1043-1044).

 The ALJ provided a lengthy analysis of both plaintiff's credibility (Tr. at 535-541) and whether plaintiff's condition meets or equals a listed impairment (Tr. at 532-535).

## A. CREDIBILITY OF PLAINTIFF

 The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

 In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work

72

record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

*Prior Work Record*

Plaintiff's poor work record does not support his credibility. He began working in 1988. His earnings reached $13,000 a year during only 4 years of his 27-year earnings record. The year when he earned the most was the year he claims he became disabled. Plaintiff admitted that he had a poor employment history, and he admitted that it was in part due to his alcohol intake (Tr. at 360, 365, 416).

Plaintiff testified that two years after his alleged onset date he was looking for work in a factory, fast food restaurant, or trucking company, and he was unable to get a job because of a felony conviction, not because of his impairments. Plaintiff testified that he missed work because he was tired and could not get out of bed, yet he said in his administrative paperwork that he lost his job because he missed work due to anxiety over working with other people. The ALJ found that plaintiff is capable of working in jobs that do not require any interaction with the general public and only occasional contact with supervisors and coworkers, which addresses plaintiff's alleged problem working with others.

Plaintiff testified that he would not be able to do a job such as a security monitor because of an inability to focus, which is something he has dealt with since he was a young child. However, despite this alleged inability to focus nearly his entire life, plaintiff has been capable of performing substantial gainful activity.

Plaintiff told Delores Lesseig in an interview in support of his application for medical assistance that he has had 30 jobs throughout his life; however, his employment records show that from 1999 through 2014, he worked for only 8 different companies.

This factor does not support plaintiff's credibility.

*Daily Activities*

Plaintiff testified that in 2009 (a year after his alleged onset date) he was able to walk a mile. During July 2009, he was walking 5 to 6 miles a day.

In 2010, a year and a half after plaintiff's alleged onset date, he said he cooked, did dishes, and did laundry (all day a couple days a week). His wife said he was able to read for 2 hours at a time, he cooked daily, and he helped take care of 7 children. He was able to mow, clean the house, and do laundry. He shopped in stores for 3 or 4 hours at a time. She said he had no problems with personal care. She said he regularly prepared four-course meals and that he "always" had energy for food which had always been a priority to him, a fact that had not changed at all since his illness, injury or condition began.

Also that year plaintiff was able to go to Iowa to attend school and obtain a commercial driver's license, and he was able to go fishing. In September 2010 (2 years after his alleged onset date) he was doing yard work. In October 2010 plaintiff had been leaning over using a weed-eater.

In May 2012, plaintiff was working on a house. In June 2012, plaintiff went to the emergency room after a horse fell on him . The record reflects that training horses was one of

74

plaintiff's favorite hobbies before his alleged onset date, but because the records of that emergency room visit were not included (but were referred to in a follow up visit with his regular doctor), it is unclear exactly what plaintiff was doing when the horse fell on him. However, this is the event that resulted in plaintiff's first narcotic prescription. In June 2012, plaintiff described "loving his work" but his work was not described. Two months later he said he had moved and was missing the horses and farm. In October 2012, plaintiff told his doctor that he was walking daily. In January 2013, he said he was exercising daily. In May 2013 he said he was exercising daily. In June 2014 he said he walking at the Y for exercise.

In 2013, nearly 5 years after plaintiff's alleged onset date, he said he was able to go out alone and use public transportation, he could shop in stores for 2 hours at a time. His mother said she had to bathe him and clean him after a bowel movement; however, plaintiff subsequently lived with other relatives and in a residential care facility and there is no evidence that he needed assistance bathing or cleaning himself after a bowel movement at those times. Furthermore, a year later in April 2014, plaintiff told a treatment provider that he was independent with self care for both physical and mental health.

Plaintiff told a treatment provider in April 2014 that he had no problem making appointments and getting to them consistently and on time.

This factor does not support plaintiff's credibility.

### Duration, Frequency, and Intensity of Symptoms

Plaintiff testified that his dizziness lasts a "matter of seconds."

Plaintiff testified that his alternating feelings of being depressed and being anxious started when he was 12 years of age. However, plaintiff was able to perform substantial gainful activity despite those lifelong alternating feelings of depression and anxiety. Plaintiff's description of the manic episodes associated with bipolar disorder was that he has an

"elevation of mood" for about three days "if I'm not on my medication." He claimed to have a regular manic phase in the middle of every month and that it has always been like that. However, again, despite allegedly having these monthly manic phases, plaintiff was able to work for many years. Furthermore, in April 2014 plaintiff told a treatment provider that his mental health history dating back to 1998 was all for depression -- he denied any mania.

In January 2009 (4 months after his alleged onset date), plaintiff denied having any mental problems. A mental health screening was done and no referral for mental health treatment was requested or needed. In January 2010 (nearly a year and a half after his alleged onset date), he said he was doing okay, he was attending school out of state to get a commercial driver's license, and his depression screen was negative. On September 18, 2012, he denied depressed mood. On November 13, 2012, he denied depressed mood and his depression screening was negative. On March 18, 2013, plaintiff denied depressed mood. On November 22, 2013, plaintiff denied depressed mood. On December 13, 2013, his depression screening was negative and his psychiatric exam was normal. On April 4, 2014, plaintiff's depression screening was negative; he denied feeling down, depressed or hopeless; and his psychiatric exam was normal.

In October 2010 plaintiff went to the doctor about back pain and described his pain as an 8 out of 10 in severity; however, he was observed to be pleasant and cooperative. In October 2012, plaintiff saw Dr. Lehnardt for back pain and described his pain as a 10 out of 10, yet he was described as having a normal mood and affect. On October 12, 2012, plaintiff described his lower back pain as an 8 out of 10 in severity and requested stronger pain medication, but again no abnormal behavior was observed and his mood was normal. On November 16, 2012, plaintiff described his back pain as a 9 out of 10 in severity; however, he was noted to be "not agitated, not anxious, fully oriented, with appropriate mood and affect"

76

and with normal behavior.  No pain medication was prescribed.  In February 2013, plaintiff described his back pain as a 7 out of 10 in severity, but he was observed to have normal balance and gait, normal mood and affect.  No pain medication was prescribed.  On March 4, 2013, plaintiff described his back pain as a 10 out of 10 in severity; however, his gait was normal, mood and affect were normal, and no abnormal behavior was observed.  No pain medication was prescribed.  By contrast, when plaintiff was in the emergency room due to a kidney stone, he described his pain as a 9 out of 10 in severity and he was noted to be grimacing, moaning and restless.  Because plaintiff described this kind of pain as less severe than his back pain when he was observed to behave normally, it would seem that he exaggerates his pain level at times.  Additionally, plaintiff told Corrie Willis on April 15, 2014, that his mood is always an 8 out of 10 with 10 being the worst, yet in the previous five months his reports of his mood were as follows:  On April 4, 2014 (ten days earlier), his depression screening was negative; he denied feeling down, depressed or hopeless; and his psychiatric exam was normal.  On December 13, 2013, his depression screening was negative and his psychiatric exam was normal.  On November 22, 2013, plaintiff denied depressed mood. There are no allegations of or findings of a severe depressed mood in any records near the time of plaintiff's description of his mood "always" being an 8 out of 10 in severity.

For a 15-month period (October 26, 2010, through January 13 2012) plaintiff did not seek any medical care or counseling.  In January 2012, plaintiff had been off all psychiatric medications for the past year, yet he was fully oriented, not agitated, not anxious, he did not have suicidal ideation, he was negative for anhedonia (inability to feel pleasure), and did not have pressured speech.  His only negative symptom was a depressed mood and affect.

77

On April 15, 2014, plaintiff said he had not had suicidal thoughts since 2004, or 10 years earlier. Yet on this same day, plaintiff told nurse Corrie Willis that he had had suicidal thoughts in the previous three months.

This factor does not support plaintiff's credibility.

## Precipitating and Aggravating Factors

Plaintiff testified that doing yard work or working around the house makes him feel worthy. When plaintiff found a job in 2007 he said it was an emotional boost for him and resulted in a "marked improvement" in his mental condition which reduced his need for counseling.

Plaintiff testified that he likes to sleep during the day and stay up at night. His depression is related to the weather (Tr. at 408, 813, 1231), his kids' moods (Tr. at 408), not being able to see his kids (Tr. at 804-807, 813, 1231, 1262), his inability to find a job (Tr. at 485), having no options in his life (Tr. at 485, 1248), being unemployed (Tr. at 485, 720-723, 736-739, 804-807), financial problems (Tr. at 475, 720-723, 736-739, 804-807, 1248, 1256), being incarcerated (Tr. at 1267), having a prison record (Tr. at 485, 475), his fear of having to go back to jail (Tr. at 485, 475), chronic life maladjustment (Tr. at 475), being on probation or parole (Tr. at 475, 1248, 1256), relationship problems (Tr. at 475, 720-723, 736-739, 804-807, 1256), and boredom (Tr. at 886-889, 890-895, 896-901).

## Dosage, Effectiveness, and Side Effects of Medication

Plaintiff testified that Robaxin helps his back pain and that he is able to sit for 2 to 3 hours at a time with this medication. Plaintiff testified that his medications help his back pain so that it is tolerable and he can move around and be mobile.

Plaintiff testified during the hearing that he would take his medications "whenever I take a notion to take them." For years after his alleged onset date, he would take his

78

medications whenever or sometimes not at all and that this was due to depression. However, there is nothing in any of the medical records about sporadic medication compliance.

On April 14, 2014, plaintiff said his mental illness is "okay as long as I'm on medications." In July 2014 plaintiff said he had been off his medications while he was in jail, but once he got out of jail and restarted his medications, things were "going a lot better."

*Functional Restrictions*

In 2010, a year and a half after plaintiff's alleged onset date, he said he was able to go out alone, he had no problem getting along with others, and he had no limitations on sitting. His wife said he was able to read for 2 hours at a time and he had no limitation on his ability to sit, squat, kneel, understand, follow directions, complete tasks, get along with others, remember or concentrate. Plaintiff testified that he can sit for 2 to 3 hours at a time and he can stand for 20 to 30 minutes at a time.

In 2013, nearly 5 years after plaintiff's alleged onset date, he said that his impairments did not affect his ability to understand, follow instructions or get along with others. He could lift 20 pounds. His mother said he could sit for an hour before needing to change positions, that he could lift 20 pounds with one hand and 40 pounds with both hands, and that she had never seen plaintiff act inappropriately with the public.

Doctors consistently recommended that plaintiff exercise (Tr. at 306-308, 312, 347-352, 432, 444-445, 771-775, 776-779, 781-785, 786-790, 791-795, 804-807, 826-829, 830-833, 834-837, 838-841, 842-845, 847, 848, 849, 850, 851, 852-853, 886-889, 896-901). In June 2013 -- almost 5 years after plaintiff's alleged onset date -- Dr. Novinger told plaintiff he should be walking two miles at a time.

On February 27, 2012 (3 1/2 years after plaintiff's alleged onset date), his counselor suggested he look for a job and helped him compile a list of places to apply.

There are no recommended restrictions in this entire record other than one nurse recommending that plaintiff elevate his legs due to edema, and that was until a recommended follow up appointment with a doctor the next week, which plaintiff did not schedule.

*Credibility Conclusion*

In addition to the above factors, I note the following: Plaintiff claimed he was in special education classes but his school records specifically state that he was not. He testified that being around 5 or more people, regardless of whether he is interacting with them, causes him to have a panic attack. However, in the 8 years of medical records before me, there is not one instance of anyone having observed anything close to a panic attack, regardless of whether plaintiff was in a hospital, doctor's office, or prison -- clearly instances when he was around at least 5 other people. Furthermore, plaintiff said in September 2014 that he was enjoying going on the outings and socializing with the people at his residential care facility, and he was "enjoying others liking being around him." Later that month he told his counselor that he was enjoying being around others, he was enjoying being "out," and he was looking forward to going to the zoo.

Plaintiff told Dr. Novinger that he was having difficulty falling asleep, resulting in a diagnosis of insomnia. However, that same day he told Brenda Sidwell that he sleeps from 7:00 a.m. until 3:00 p.m. every day -- which is eight hours of sleep each day. Ms. Sidwell recognized that plaintiff does not suffer from insomnia, he just had his days and nights turned around. Plaintiff's mother said that plaintiff stays up all night eating, and plaintiff said that he likes to sleep during the day and stay up at night.

The Polaski analysis and the inconsistencies in plaintiff's allegations support the ALJ's finding that plaintiff's testimony is not credible. This includes his testimony about the alternating nature of his moods.

80

B.    *CRITERIA FOR LISTINGS*

The ALJ addressed whether the substantial evidence in the record establishes a listed

impairment.

*Activities of Daily Living*

> In activities of daily living, the claimant has mild restriction. The claimant is not limited to a greater degree in this area because, for example, there is no substantial evidence that the claimant is unable to perform adaptive activities such as performing personal grooming and hygiene, performing simple chores, and shopping. In his function report, the claimant reports difficulty with personal care, states he does not prepare his own meals, and that he does not perform any household chores. However, he has been able to attend to some household chores during the relevant period such as yard work. . . . He reportedly gets out of the house 3-6 times per months. He can go out alone and is capable of using public transportation. He is able to shop for food and handle his own finances. In April 2010, he went fishing with his father and has also looked for work during the relevant period. . . .

(Tr. at 532-533).

In addition to the specific examples cited by the ALJ, the following supports the ALJ's

finding that plaintiff suffers from only mild restriction in activities of daily living. Plaintiff

testified that in 2009 (a year after his alleged onset date) he was able to walk a mile. During

July 2009, he was walking 5 to 6 miles a day.

In 2010, a year and a half after plaintiff's alleged onset date, he said he cooked, did

dishes, and did laundry all day a couple days a week. His wife said he was able to read for 2

hours at a time, he cooked daily, and he helped take care of 7 children. He was able to mow,

clean the house, and do laundry. He shopped in stores for 3 or 4 hours at a time. She said he

had no problems with personal care. She said he regularly prepared four-course meals and

that he "always" had energy for food which had always been a priority to him, a fact that had

not changed at all since his illness, injury or condition began. Also that year plaintiff was able

to go to Iowa to attend school and obtain a commercial driver's license. In May 2012, plaintiff

was working on a house; in June 2012, he had been engaging in some activity which resulted

in a horse falling on him. In October 2012, plaintiff told his doctor that he was walking daily. In January 2013, he said he was exercising daily. In May 2013 he said he was exercising daily. In June 2014 he said he walking at the Y for exercise.

In 2013, nearly 5 years after plaintiff's alleged onset date, he said he was able to go out alone and use public transportation, he could shop in stores for 2 hours at a time. Plaintiff and his mother alleged in administrative documents that she had to bathe him and clean him after a bowel movement; however, plaintiff subsequently told a treatment provider that he was independent with self care for both physical and mental health, and this was nearly 6 years after his alleged onset date. Plaintiff also said at that time that he had no problem making appointments and getting to them consistently and on time.

The substantial evidence in the record supports the ALJ's finding that plaintiff suffers from no more than mild restriction in activities of daily living.

### Maintaining Social Functioning

The ALJ found that plaintiff was moderately limited in maintaining social functioning.

The claimant is not limited to a greater degree in this area because for example, there is no substantial evidence that the claimant lacks a knowledge of standards of neatness and decorum. There is also no substantial evidence that the claimant shows significant signs of tangential/circumstantial thought, loose associations, homicidal ideation, excessive paranoia, or excessive hallucinations or delusions. Medical expert Alfred Jonas testified that the claimant experienced no more than moderate difficulties in social functioning. I find his opinion to be generally supported by the evidence. While incarcerated in 2009, there is no evidence in the record indicating the claimant had any major difficulties getting along with other inmates or prison guards. The claimant indicated in his function report that he visits daily with others and shops on a monthly basis. He also reported no problems getting along with others or with authority figures. The claimant reportedly has six children . . . He reports that he has a very positive relationship with each of them and talks to them weekly. In February 2014, he reported to Cindy Mayberry that he had established a good relationship with his daughter, that he spoke to her almost every night for an hour, that he had learned to listen and tell how he feels, and that he was feeling sheer joy. He also reported at that time that he could go to the store without feeling like he was going to have a panic attack. In September 2014, he reported to Ms. Mayberry that he was enjoying being around others, and that he wanted to start exercising more. He said that he enjoyed being out and was looking forward to going to the zoo.

(Tr. at 533).

The regulations state that social functioning refers to a claimant's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. Impaired social functioning can be established by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. Strength in social functioning can be established by such things as the ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.

In the 8 years of medical records before me, there is not one instance of anyone having observed any inappropriate behavior by plaintiff regardless of whether he was in a hospital, doctor's office, or prison. In March 2010, plaintiff's wife said he has no problem getting along with others. In May 2013 plaintiff said that his impairments do not affect his ability to get along with others. Michael Stacy, Ph.D., found that plaintiff was not significantly limited in his ability to get along with others. The only family conflicts in the record are conflicts with plaintiff's ex-wife (which, without more, is hardly evidence of a mental impairment), and one instance when he had a disagreement with his mother over a family situation. Plaintiff got along with his dad, all of his kids, his mom, his aunt, his uncle, his counselors, his doctors, his nurses, prison staff, other inmates, and the other residents at the residential care facility.

The substantial evidence in the record supports the ALJ's finding that plaintiff does not have more than a moderate limitation in maintaining social functioning.

*Maintaining concentration, persistence or pace*

The ALJ found that plaintiff suffers from moderate difficulties in maintaining concentration, persistence or pace.

83

The claimant is not limited to a greater degree in this area because, for example, the claimant has demonstrated the ability to sustain focused attention sufficiently long to permit timely and appropriate completion of tasks commonly found in work settings, such as everyday household routines. The claimant can work at a consistent pace until a task is completed, demonstrating the ability to repeat sequences of action to achieve a goal or objective. During a psychiatric evaluation in November 2009, he demonstrated good long-term and short-term memory, was able to count down by sevens from 100 with only one mistake, was able to name six of the most recent past presidents, and named three major cities. Around that same time, he took classes to obtain his Commercial Driver's Licence (CDL) and obtained his CDL shortly thereafter. In his function report that he completed in May 2013, he reported that he was able to drive, which indicates an ability to perform the mental activities associated therewith, including simultaneously and independently operating a motor vehicle, attending to his surroundings, navigating, and dealing with the stresses associated with driving. While testifying during the lengthy 2-hour hearing, I note that the claimant was able to follow the proceedings and stay on point.

(Tr. at 533-534).

In addition, plaintiff's wife said that if something is interesting to him, plaintiff can pay attention for hours. She said his condition does not affect his ability to concentrate. In fact, the only references in the record to an impaired ability to concentrate were plaintiff's own allegations.[15] Plaintiff's medical records include observations by treatment providers that his concentration was:

| | |
|---|---|
| Improved on February 3, 2010 | Improved on March 4, 2010 |
| Good on March 10, 2010 | Increased on April 8, 2010 |
| Good on April 15, 2010 | Improving on May 11, 2010 |
| Intact on May 18, 2010 | OK on June 27, 2012 |
| OK on October 2, 2012 | Improved on February 19, 2013 |

_____

[15] I will not address the opinion of nurse Cynthia Mayberry. Her opinions were discredited by the first ALJ, the district court agreed with that finding, and after a thorough review of the record, I too find that Ms. Mayberry's opinions are not credible and not based on the evidence.

84

In addition, Dr. Stacy found that plaintiff was not significantly limited in his ability to concentrate, and Dr. Jonas found that plaintiff had at most a mild impairment in his ability to concentrate.

Plaintiff's wife said that plaintiff reads for 1 to 2 hours at a time every day. Plaintiff said he is good at reading. His wife said he is good at reading. He said he would read scripture for a half an hour at a time. In his function report plaintiff said he needed no reminders for appointments. In 2014 he told a treatment provider that he needed no reminders for appointments. Plaintiff has consistently stated that he is capable of handling bank accounts and his own finances.

There is no evidence that plaintiff suffers from more than a moderate limitation in maintaining concentration, persistence or pace.

Based on all of the above, I find that the ALJ addressed these issues as directed by the district court. I further find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's impairments do not meet or equal Listing 12.04 or Listing 12.06.

## VII. ALTERNATING NATURE OF PLAINTIFF'S MENTAL CONDITION

The district court directed the ALJ to discuss plaintiff's testimony regarding the intermittent and alternating nature of his mental condition and assess his credibility, and then consider at what level plaintiff can function on a sustained basis.

The ALJ addressed plaintiff's allegations of bipolar disorder, which is the basis of the "intermittent and alternating" nature of his mental condition. The ALJ also addressed the diagnoses of posttraumatic stress disorder.

> There is evidence of diagnoses of bipolar disorder and post traumatic stress disorder in the record; however, I find these to be non-medically determinable impairments. A physical or mental impairment is an impairment that results from anatomical, physiological or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. For a condition to be classified as a medically determinable impairment, there must be evidence from an

85

acceptable medical source in order to establish the existence of the medically determinable impairment that can reasonably be expected to produce the symptoms. At the hearing, medical expert Alfred Jonas testified that he reviewed the record and found there to be no evidentiary basis to support a diagnosis of post traumatic stress disorder or bipolar. Upon reviewing the record, I agree with Dr. Jonas' assessment. There is no substantial evidence in the record of documented mania, and there is no substantial evidence of documented traumatic events as to support a diagnosis of either post traumatic stress disorder or bipolar disorder.

(Tr. at 530-531).

### Posttraumatic Stress Disorder

Plaintiff testified he is not even aware of ever having been diagnosed with posttraumatic stress disorder; however, the trauma associated with such a diagnosis would have been his divorce, his kids graduating and moving away, and a grudge against his mother for how she treated him as a child.[16] However, in treatment records plaintiff said he had a good relationship with his mother and denied any abuse during childhood. Additionally, plaintiff denied ever having been the victim of abuse, rather he said he had been the abuser and his flashbacks were related to his own behavior in relationships, behavior which he later regretted.

The diagnoses of posttraumatic stress disorder are made -- in every instance save one -- by Nurse Cynthia Mayberry:

- Nurse Delores Lesseig diagnosed PTSD 9 months before plaintiff's alleged onset date after plaintiff said he has flashbacks. There is no evidence that Ms. Lesseig even asked plaintiff about the flashbacks as there is no further mention of them in her records.

- Nurse Cynthia Mayberry diagnosed PTSD on February 26, 2010, after plaintiff reported frequent flashbacks. Again, Ms. Mayberry did not even ask plaintiff about the flashbacks but made this diagnosis based solely on his statement that he has flashbacks.

- Nurse Cynthia Mayberry diagnosed PTSD on March 4, 2010, because plaintiff reported frequent flashbacks. Ms. Mayberry did not get any further information from plaintiff.

---

[16]Dr. Jonas testified that these things are not the kind of traumatic event that would qualify for a diagnosis of posttraumatic stress disorder (Tr. at 935).

- Nurse Cynthia Mayberry diagnosed PTSD on March 10, 2010, apparently because she had before. During this visit plaintiff specifically denied flashbacks. He said he was doing well and been happy the whole week. All of Ms. Mayberry's observations were normal.

- Nurse Cynthia Mayberry diagnosed PTSD on April 8, 2010, after plaintiff said he had occasional flashbacks. No further information was obtained.

- Nurse Cynthia Mayberry diagnosed PTSD on May 11, 2010, when plaintiff reported flashbacks; however, plaintiff described his flashbacks as "reminiscing." This did not cause Ms. Mayberry to clarify what plaintiff meant when he reported flashbacks. The fact that he uttered the word was apparently sufficient for this diagnosis.

- Nurse Cynthia Mayberry diagnosed PTSD on September 28, 2010, because she had in the past.[17] Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on March 23, 2012, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on April 11, 2012, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on May 8, 2012, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on August 6, 2012, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on February 19, 2013, after plaintiff said that his flashbacks were rare. Again, there was no follow up.

- Nurse Cynthia Mayberry diagnosed PTSD on April 16, 2013, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on November 13, 2013, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

---

[17] I note that Ms. Mayberry's records are handwritten, so there is no issue with computerized records being copied from one visit to another.

- Nurse Cynthia Mayberry diagnosed PTSD on February 11, 2014, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on March 12, 2014, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on April 16, 2014, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

- Nurse Cynthia Mayberry diagnosed PTSD on September 10, 2014, because she had in the past. Plaintiff did not allege flashbacks and there is no mention of any symptom of PTSD in the record.

No doctor has ever diagnosed posttraumatic stress disorder. The opinion of Ms. Mayberry was previously given no weight, and this finding was affirmed by the district court (Tr. at 1041). Without further elaboration, I find that the records of Ms. Mayberry are not supported by the evidence, are internally inconsistent, rely almost exclusively on plaintiff's allegations, and are entitled to no weight.

### Bipolar Disorder

Dr. Jonas, the medical expert, testified as follows:

    A.    Bipolar disorder, or the diagnosis of bipolar disorder, is essentially dependent on one thing, and that is the presence of any episode ever -- it doesn't have to be active -- but ever of mania. It doesn't exist in this record. Nobody -- there's no record here that ever gives us the description of a manic person. So the other thing that the diagnosis gets based on all the time, which is unreasonable but it happens constantly, is somebody's description of something like unstable mood or irritability or something like that. And the diagnosis really comes from the eagerness or the hunger to make the diagnosis, more than it comes from any real understanding of the person. So there's just nothing in this record ever that is a reasonable support for that diagnosis.

    Q.    So basically there's no documentation of a hyper-manic episode anywhere in the record?

    A.    Right.

* * * * *

88

A.     . . . Geodon is an anti-psychotic.  And I will assume like as is true of most anti-psychotics, they are also treated as if they were somehow mood stabilizers or anti-mania medications.  So I will guess that the purpose of prescribing Geodon to the claimant is to treat the thing that somebody thinks is bipolar disorder.  The problem is apart from the fact that there is no bipolar disorder, there's nothing in the record that tells us that the claimant has bipolar disorder.  Geodon essentially in my experience, I've seen it over the years, doesn't work.  That the occasional times that I've heard somebody insist that it really does work is at times that the dose has been the maximum dose which is 160 milligrams a day.  Nobody has ever claimed it works at a dose lower than that.  So this claimant is getting 80 milligrams a day which is half the dose that anybody would even want to allege does anything.

Q.     Okay.  Because I noticed there was a time when they even added -- I mean just taking Geodon and then he had some symptoms he complained about and they added some more Geodon.  So you're saying that's really not accomplishing anything?

A.     Well, in my experience it doesn't.

Q.     Okay.

A.     And we don't see the problems for which Geodon should be considered treatment.  But you know, if somebody said, no, I've seen Mr. Couch when he was manic and he definitely was manic, no question about it. Why you don't have the records, I don't know.  But it's definitely true and Geodon, 80 milligrams a day, is what made that mania go away, then I'll say fine.  Then he's not manic because the doctor says that only 80 milligrams was good enough to solve the problem.

(Tr. at 947-949).

According to the Mayo Clinic, the criteria for Bipolar I Disorder are consistent with the

testimony of Dr. Jonas:

You've had at least one manic episode.  The manic episode may be preceded by or followed by hypomanic or major depressive episodes.  Mania symptoms cause significant impairment in your life and may require hospitalization or trigger a break from reality (psychosis).

http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/symptoms/con-200 27544

Any evidence of the intermittent and alternating nature of plaintiff's condition as

referenced by the district court will be considered in this section dealing with bipolar disorder.

89

When questioned about the depressive/manic phases of bipolar disorder, plaintiff testified that on his "down" days he seldom interacts with his family, but on his "up" days he takes his kids to the park where he sits on a bench and watches them play. This does not describe alternating episodes of depression and mania, and it is not the type of alternating and intermittent condition that would impact a residual functional capacity assessment.

Plaintiff testified that he was diagnosed with bipolar disorder after he started getting "uncomfortable feelings" mixed in which his depression. Again, this is not sufficient for either the diagnosis of bipolar disorder or for any reduction in residual functional capacity.

Plaintiff told Delores Lesseig, a nurse practitioner, that he had no history of mania. It was noted that no manic behavior was observed while plaintiff was incarcerated.

The records reflect that plaintiff was never diagnosed with bipolar disorder by a doctor other than one who included it in the list of diagnoses without actually treating plaintiff for his mental health condition:

- Social worker Brenda Sidwell diagnosed bipolar disorder on January 5, 2010. It is unclear why that diagnosis was made other than the fact that plaintiff was apparently taking Geodon, which treats mania associated with bipolar disorder. Plaintiff said he was taking Geodon, having been prescribed by Nurse Cynthia Mayberry. Plaintiff had recently been released from prison and was trying to get his commercial driver's license. He said he was doing OK at this time. His affect was positive. His depression screen was negative. No abnormal observations or findings are listed in this record.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on February 26, 2010, but it is unclear why. Plaintiff said he was feeling depressed but he said Geodon was working OK.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on March 4, 2010. Plaintiff said he was battling depression which was related to the weather and his kids' moods. His mental status exam was normal except depressed mood. He was having no panic and no anxiety.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on March 10, 2010, despite plaintiff stating that he was doing well and had been happy the whole week. His mental status exam was completely normal.

90

- Nurse Cynthia Mayberry diagnosed bipolar disorder on April 8, 2010, despite a normal mental status exam and plaintiff's report of no problems.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on May 11, 2010. Plaintiff had no negatives to report, and his mental status exam was completely normal except Ms. Mayberry wrote that his mood/affect was "fluctuating." On this visit plaintiff described his flashbacks as reminiscing and denied any other mental health symptom.

On May 18, 2010, plaintiff went to Blessing Hospital complaining of bipolar disorder.

He told the hospital staff he was being treated for bipolar disorder by nurse Cynthia Mayberry.

He was not diagnosed with bipolar disorder by anyone during this hospital visit despite having

been admitted for 7 days. He was diagnosed with major depressive disorder without psychotic

features and dependent personality disorder.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on September 28, 2010, despite plaintiff's completely normal mental status exam. His only negative complaints were that he had anxiety once in a while, his concentration was poor and his energy was "not too good." He asked Ms. Mayberry to complete a Medical Source Statement Mental that same day.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on March 23, 2012, after plaintiff reported high anxiety and depression; however, he had been off his medications for over a year and had just recently gotten new prescriptions.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on April 11, 2012, after plaintiff said he wanted someone or something to rescue him.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on May 8, 2012, even though plaintiff said he was doing much better, life had fallen into place for him, he was working on a house, and Ms. Mayberry made no abnormal observations or findings.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on August 6, 2012, after plaintiff, who had recently moved, said he was worried about running into a former wife.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on February 19, 2013. Although plaintiff said he had found some peace, Ms. Mayberry noted that his thought process was "racing, bouncing," and his mood was anxious. The rest of his mental status exam was normal.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on April 16, 2013, after plaintiff said he was distraught over not being able to see his kids.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on November 13, 2013, after plaintiff said his wife would not let him see the kids.

On November 22, 2013, Dr. Novinger listed bipolar disorder as a problem he discussed with plaintiff. At this point, plaintiff had been told by Ms. Mayberry for the past 4 years that he had bipolar disorder. There is no evidence this was a diagnosis in Dr. Novinger's record. In fact, during this visit, plaintiff denied depressed mood, he demonstrated appropriate mood and affect, and he was fully oriented. Plaintiff had come to the doctor for a men's preventative visit and had requested a prescription for narcotic pain medicine. Dr. Novinger assessed chronic pain syndrome; he did not treat plaintiff for any mental condition.

- On December 13, 2013, plaintiff saw Dr. Novinger for a follow up on lab work. His depression screening was negative and his psychiatric exam was normal. "Bipolar disorder, unspecified" was listed under chronic conditions. In the list of diagnoses, Dr. Novinger included "bipolar disorder, unspecified" and noted that it "seems well controlled." Clearly this diagnosis was in the record based on plaintiff's belief that he had been treated for bipolar disorder for the past four years.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on February 11, 2014, because she had in the past. Plaintiff reported a good relationship with his kids, social activities, and being able to go to Wal-Mart without feeling like he is going to have a panic attack.

- On February 21, 2014, plaintiff saw Dr. Novinger for cold symptoms. The doctor noted that plaintiff's mood was stable and his psychiatric exam was normal. Plaintiff requested narcotic pain medication and that was provided. Dr. Novinger's records list bipolar disorder, unspecified, but clearly there is nothing in this record to support such a diagnosis -- plaintiff was not being seen for any mental health complaints that day, and he was not treated for any mental health condition that day.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on March 12, 2014, despite plaintiff reporting that he was feeling good except he had "some continuing anxiety."

- On April 4, 2014, plaintiff saw Dr. Novinger for back pain. His depression screening was negative, he denied feeling down, depressed or hopeless, he denied having little interest or pleasure in doing things. His psychiatric exam was normal. Dr. Novinger included in his assessment "bipolar disorder, unspecified" and commented that "it seems" plaintiff is unable to stop taking Geodon.

On April 15, 2014, plaintiff saw nurse Corrie Willis and said all of his mental health problems in the past had been for depression, but he "reported" Bipolar I Disorder. He alleged racing thoughts, that his mind at night is "always going," poor impulse control and anger issues. He was diagnosed with major depression and panic disorder, not bipolar disorder.

92

- The very next day, Nurse Cynthia Mayberry diagnosed bipolar disorder after plaintiff said he was doing better.

- Nurse Cynthia Mayberry diagnosed bipolar disorder on September 10, 2014, after plaintiff said he was doing better, enjoying being out, and looking forward to going to the zoo.

Dr. Stacy acknowledged that Ms. Mayberry had diagnosed plaintiff with bipolar disorder but noted that she was not qualified to make that diagnosis.

It is clear that there is no basis in the medical records for a diagnosis of bipolar disorder.

As far as the intermittent and alternating aspect of plaintiff's mental health symptoms which do not rise to the level of bipolar disorder, I will not repeat here all of plaintiff's records reflecting mental health exams. After a thorough review of those records, however, I find that they support the ALJ's finding on this point. There simply is nothing else to say about the intermittent and alternating aspect of plaintiff's mental health symptoms because there is not much in the record beyond mild to moderate symptoms sprinkled in among normal observations and findings.

## VIII.   SWELLING, URINATION, DIZZINESS, HEADACHE

Finally, the district court remanded with instructions to consider plaintiff's evidence of headaches, edema, dizziness and frequent urination and their effect on his residual functional capacity.

### Edema

The record shows little evidence of the presence of edema and no evidence that it ever interfered with his residual functional capacity.

- Plaintiff denied edema on January 16, 2009.

- Mild edema was noted on January 5, 2010, Furosemide was prescribed.

- No edema was present on May 18, 2010.

93

- Trace edema was present on September 1, 2010.

- No edema was present on September 14, 2010.

- No edema was present on September 22, 2010.

- No edema was present on October 20, 2010.

- No edema was present on January 13, 2012, despite plaintiff's not having been on a diuretic for over a year.

- No edema was present on February 27, 2012.

- No edema was present on September 18, 2012.

- No edema was present on October 5, 2012.

- Edema was present on October 12, 2012.

- No edema was present on November 13, 2012.

- Edema was present on November 16, 2012.

- Edema was present on January 4, 2013.

- Edema was present on March 4, 2013.

- Edema was present on March 18, 2013 -- plaintiff said he was continuing to eat food that had salt already in it, and he had not taken a diuretic in several years. He was prescribed a diuretic and told by a nurse to keep his legs elevated and come back in a week for a follow up. He did not have another medical appointment for two months.

- Edema was present on May 13, 2013. Dr. Lehnardt did not tell plaintiff to elevate his legs despite the presence of edema and the nurse's instructions a couple of month ago that plaintiff should elevate his legs.

- No edema was present on June 7, 2013.

- Plaintiff's pharmacy records show that he last filled his diuretic on October 9, 2013. He told Dr. Novinger on November 22, 2013, that he stopped taking the diuretic a month ago.

Plaintiff had no edema on this day.

- No edema was present on April 4, 2014.

Edema has never been described as affecting plaintiff's functional restrictions; no doctor has ever told plaintiff to avoid sitting, standing or walking; no doctor has ever told plaintiff he needs to lie down or elevate his legs. There is nothing in the record to substantiate plaintiff's testimony that he must lie down for hours every day due to edema.

*Frequent Urination*

Plaintiff testified that since being switched to a different diuretic, his urination is not as frequent and the medication helps with his swelling (Tr. at 972). He testified that he switched the time of day he took another medication due to being tired; however, there is no evidence in any of the medical records that plaintiff talked to his doctors about perhaps taking his diuretic at any other time of the day (for example in the evening which would be after working hours, and since his frequent urination only lasts a couple of hours, the frequent urination would taper off before bedtime).

Despite that, I note that plaintiff denied frequent urination on the following dates: January 16, 2009; January 20, 2009; May 18, 2010; October 12, 2012; November 16, 2012; January 4, 2013; March 4, 2013; and April 4, 2014.

On September 14, 2010, he reported that he was urinating a little bit more often. He reported frequent urination on September 21, 2013, when he was in the emergency room due to a kidney stone.

There is no other evidence in the medical records to support plaintiff's allegation that he needs frequent breaks away from his work station to urinate due to using a diuretic or for any other reasons.

95

*Dizziness*

Plaintiff testified that his dizziness only lasts for a matter of seconds and only occurs when he gets up too fast. On January 16, 2009, he denied dizziness. There is no other evidence of dizziness.

*Headache*

Plaintiff testified that he does not get headaches as often anymore, maybe about once a month. He testified that they are not significant enough to require any medication.

The medical records show that plaintiff denied headaches on the following dates: January 16, 2009; May 18, 2010; October 5, 2012; October 12, 2012; January 4, 2013; March 4, 2013; and May 13, 2013.

He reported recent headaches only on November 16, 2012.

*The ALJ's Opinion Regarding These Symptoms*

The ALJ adequately addressed these symptoms in her lengthy order and analyzed plaintiff's credibility with regard to his allegations that these symptoms affect his residual functional capacity. I find that the substantial evidence in the record supports the ALJ's findings on this issue.

## IX.  CONCLUSIONS

I find that the ALJ adequately addressed everything in the district court's remand order. I further find that plaintiff's remaining arguments are wholly without merit. Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 17, 2016